## BOLLMAN v. TWEEDIE TRADING CO.

(District Court, S. D. New York. January 22, 1907.)

1. SHIPPING—CHARTERS—CONSTRUCTION—DOCKING VESSEL.

A charter provided that, as the steamer might be from time to time employed in tropical waters during the term of the charter, she should be docked, bottom-cleaned, and painted whenever the master should think necessary, but at least once in every six months, and that payment of hire should be suspended until she was again in proper state for service. The vessel arrived in New York, after having made a voyage to South America, on March 30, 1905, with cargo to be delivered in Boston, where she went and discharged such cargo, returning immediately to New York for docking. The time for docking under the six months' clause expired April 13, 1905. Held, that when the steamer returned to New York it was on the charterer's time, and that the hire continued, except for the period consumed for docking in New York.

2. SAME—INJURIES TO VESSEL.

A charter party provided that the owner should supply under the contract all provisions, wages, etc., and maintain the vessel in an efficient state, and that he should furnish tackle to handle ordinary cargo up to three tons, and to work the winches day and night, if required. The charterer was to furnish the coals, etc., and all other charges not otherwise specified. The charterer loaded the vessel with locomotive machinery and placed upon her a large wooden boom, with a wooden shoe, fitted with ring bolts to be used in handling the cargo. After the vessel had been docked at Havana, the ship's employés, acting as the servants of the charterer, constructed the boom and shoe, and with the same attempted to raise a package weighing about eight tons. As it was being lowered over the side of the vessel, a bolt in the shoe broke, bringing the weight of the package and broken appliances against the foremast, to which they were attached, which caused it to break and do damage to the vessel. Held, that the operation of such special machinery was at the risk of the charterer, and that the latter was, therefore, responsible for the injuries so caused.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 220.]

Convers & Kirlin, for libellant.
Wheeler, Cortis & Haight, for respondent.

ADAMS, District Judge. This action was brought by Johann Bollman, agent for the owners of the steamship Otto Sverdrup, to recover (1) the sum of $642.10, which it is alleged was improperly deducted from the hire of that steamer; (2) the cost of repairs and for damage to the vessel's foremast, amounting to $1,777.33, caused in discharging a heavy package of machinery at Havana. The answer of the respondent to the first claim is that the steamer was delayed for the period claimed while she was in owners' hands for the purpose of dry docking and the answer to the second claim is that the ship was required to but did not furnish proper appliances for discharging, hence the damage.

1. The Sverdrup was a new steel vessel, built in 1904, at Shields, from whence she made a voyage to the Baltic Sea, etc., and to Hull, England, where she was dry docked on October 13, 1904. She then came here in ballast to enter upon a charter with the respondent for six months, which on March 17, 1905, was prolonged for a period of twelve months. She was first delivered to the respondent on the 5th day of November, 1904, at 6 A. M. and was in its service at the time of the trial.

The charter contained the following clause:

"21. That as the steamer may be from time to time employed in tropical waters during the term of this Charter, steamer is to be docked, bottom cleaned and painted whenever Charterers and Master think necessary, but at least once in every six months, and payment of the hire to be suspended until she is again in proper state for the service."

The vessel first loaded for the charterer a general cargo for South America, where she discharged and loaded cargo for New York and Boston. She arrived in New York on March 30, 1905, and an immediate controversy began between the master and the respondent's executive officers with respect to the docking, the former claiming that as the time for docking had not arrived, the ship was entitled to go to Boston, for which place she had some cargo, and discharge and then return to New York for another cargo for South America, which the charterer proposed loading her with, and dock in New York. The charterer alleges it was agreed that it was advisable for the vessel to be docked, etc., and she was delivered to the owners for such purpose on the completion of the discharge of her Boston cargo and it was then the duty of the ship to return to New York upon the owners' time and it accordingly deducted such time from the hire.

The time for docking under the 6 months' clause, supra, expired April 13th. There was no agreement between the parties with respect to docking other than that contained in the charter. They both thought it advisable that docking should be done before the beginning of another voyage but there was no agreement about it or with regard to Boston. The charterer notified the master that it would assume the position taken here but the master ignored the notification and, through the owners made arrangements for docking in New York, as he was apparently entitled to do. When the steamer returned to New York, it was upon the charterer's time and hire continued as claimed in the libel except for the period consumed for docking in New York, said to have been about 8 hours. For this time the charterer is entitled to credit.

2. The cost of repairs and damage to the vessel's foremast.

The charterer loaded the vessel with locomotive machinery and other cargo at Philadelphia and placed upon her a large wooden boom and a wooden shoe, made with three pieces of oak 10x12 inches, bolted together. The dimensions of the shoe were 3 feet by 5 feet 6 inches long and 10 inches deep. The shoe had been slightly hollowed out on top at the center so that the end of the boom might rest upon it. It was fitted with two ring bolts of about one inch iron, having rings on the end of them 4½ inches in diameter. There was one ring

bolt at each end of the shoe. The apparatus was to be used in handling the cargo.

The vessel proceeded to Havana, en route to points further south, and went alongside of a wharf there to which she was ordered by the charterer and arranged to discharge, using the boom and shoe. They were rigged up by the crew of the ship, who were competent men in general ship work but not especially experienced in matters of this kind. The charterer's agents in Havana invoked their assistance, which the master furnished, saying that he would not be responsible for anything. The stevedores then took charge of the unloading and their winchmen were driving the winch when a package weighing about 8 tons, being lowered over the side of the vessel, proved too heavy for the apparatus, and a bolt in the shoe broke. The weight and strain of the package and the broken appliance were brought violently against the foremast, to which they were attached, and caused it to break and other damage was done to the vessel thereby.

The claim of the libellant is that the respondent was under the obligation to remove the cargo without damaging the vessel and that the gear used was of insufficient strength and the respondent therefore was responsible for the damage.

The respondent alleges that the accident was caused by a latent defect in the shoe, which was not discoverable by a careful inspection, and for which the respondent is not liable, or by the insufficiency of the mast or by the negligence of the owner in improperly rigging the derrick and shoe or by some other cause or act for which the respondent is not liable.

The contract contains the following provisions:

"Witnesseth, That the said owners agree to let, and the said charterers agree to hire the said steamship from the time of delivery, for about six (6) calendar months Steamer to be placed at the disposal of the Charterers, at a safe U. S. A. Atlantic port at charterers option as ordered by them on arrival at any U. S. Atlantic port or place at owners option in such dock or at such wharf or place (where she may always safely lie afloat, at all times of tide), as the Charterers may direct, and being on her delivery ready to receive cargo, and tight, staunch strong and in every way fitted for the service, including dunnage as may be on board, having water ballast steam winches and donkey boiler (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), and to be so maintained during the continuation of this Charter Party; to be employed in carrying lawful merchandise. * * *

1. That the owner shall provide and pay for all provisions, wages and Consular shipping and discharging fees of the Captain, Officers, Engineers, Firemen and Crew; shall pay for the insurance of the vessel, also for all the cabin, deck, engine room and other necessary stores, and maintain her in a thoroughly efficient state, in hull and machinery for and during the service.

2. That the Charterers shall provide and pay for all the Coals, Fuel, Port Charges, Pilotages, Agencies, Commissions, Consular Charges (except those pertaining to the Captain, officers or crew), and all other charges whatsoever except those before stated.

22. That the Owners are to provide ropes, falls, slings and blocks, necessary to handle ordinary cargo up to three tons (of 2,240 lbs. each) in weight, also lanterns for night work.

23. Steamer to work night and day if required by Charterers, and all steam winches to be at Charterers' disposal during loading and discharging, and steamer to provide men to work same both day and night as required,

Charterers agreeing to pay extra expense if any incurred by reason of night work, at the current local rate."

There has been considerable controversy with respect to the use of the ring bolt for the purpose of fastening the shoe, it being contended by the libelant that such a use was proper and by the charterer that it was not. Assuming it was not proper, could such a result as happened have been foreseen and if so who was responsible for it?

Section 22, quoted above, provides that the owners shall furnish tackle to handle ordinary cargo up to three tons in weight. This package weighted about seven tons. Evidently it was not a part of the ship's duty to furnish such tackle. The agreement to furnish the same up to three tons excluded anything beyond that capacity under familiar principles. This part of the tackle was furnished by the charterer.

The only real question is whether the ship is liable because of using the bolt to make the shoe fast, it being urged, and supported by some testimony, that it was not designed for such a purpose. This has been strenuously contradicted and it is not at all certain that its use was not proper, but assuming that it was not, with whom does the liability rest? The owner was to supply under the contract all provisions, wages, etc. and maintain the vessel in an efficient state (Par. 1); to furnish tackle to handle ordinary cargo up to three tons in weight (Par. 22) and to work the winches day and night if required (Par. 23). The charterer was to furnish the coals, etc., and all other charges not otherwise specified. As between these parties, it was apparently the charterer's duty to make the tackle fast so that it could be used safely and that duty involved the use of the ring bolt which broke. As a matter of fact the bolt was made fast by a member of the crew of the vessel but he was acting for the charterer in the performance of the latter's duty. The ship was damaged and I think the charterer should pay for it. The ship did not agree to furnish men to put up the charterer's special machinery and when the master consented to do it, he naturally protested and said that it, and the following use, would be at the charterer's risk. It seems that he was right in this position and it follows that the libellant should recover the damages he has suffered.

Decree for the libellant, with an order of reference.