SCOTTISH NAV. CO., Limited, v. MUNSON S. S. LINE.

MUNSON S. S. LINE v. SCOTTISH NAV. CO., Limited.

(Circuit Court of Appeals, Second Circuit. February 1, 1926.)

No. 161.

1. Shipping ⊕=58(2)—Evidence held to show that weight of log loaded on chartered vessel was not such as to cause mast to buckle.

As respects charterer's liability to owner for damages to ship by negligent loading, evidence *held* to show that log loaded on ship was not so unduly heavy as to have caused buckling of the mast.

2. Shipping ⊕=58(2)—In action by owner against charterer, stevedoring in loading logs held, on evidence, up to local standard of excellence.

In absence of all record of contemporaneous complaint in ship's log as to stevedoring being cause of buckling of mast while loading logs, and in report of damage compiled by a Lloyd's surveyor, *held*, on evidence, that stevedoring in loading logs on shipboard was up to local standard.

3. Shipping ⊕=58(2).

Evidence *held* to show that mast, which broke while loading chartered vessel, which had been in place 20 years and had been repaired, was weak.

4. Shipping ⊕=42—Limitation in charter party that required capacity of ship's gear was three tons would not place corresponding limitation on mast.

Limitation in charter party that required capacity of ship's gear should be only three tons *held* not to place a corresponding limitation on the strength of mast, as owner was bound to furnish mast reasonably strong for contemplated ship's purposes.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by the Scottish Navigation Company, Limited, against the Munson Steamship Line, wherein respondent filed a cross-libel. From the interlocutory decree, libelant appeals. Affirmed.

The libelant Scottish Company owns the steamship Dunolly, which was chartered (time charter government form) to the Munson Line. The charterers sent her to Prinzapolca, Nicaragua, to load mahogany logs. At that place there is no harbor, and the ship lay about a mile and a half from shore in a heavy swell, wherefore she rolled excessively.

The logs were rafted out alongside, and had to be lifted from the water into the hold, and then stowed or tiered, something rendered peculiarly difficult by the rolling of the ship, and by the fact that the Dunolly's hold contained very numerous stanchions.

The charter party contained the usual provision that the owners would keep the steamer "in a thoroughly efficient state in hull, machinery, and equipment for and during the service," and also that the ship should "provide gear capable of handling lifts up to three tons * * * all gear for heavier lifts shall be for charterer's account."

At Prinzapolca a log, whose weight is variously estimated from one to something over three tons, had been lifted from the water and placed in the hold. By a system of hooks in the log attached to falls leading to the winches the tiering or stowing of this log was undertaken. It was being moved from the center of the hatch to the port wing, when the log, according to uncontradicted testimony, caught on another log, while the winches were operating at full speed. Almost at once the mainmast, to which the derrick was attached, buckled at a point about 16 feet above the deck.

The original libel was brought by the shipowner against the charterer to recover for the damage to the mast, on the ground that, "while respondent's stevedores were operating the winch and shifting a heavy log in No. 3 lower hold, the work was done so negligently" that the buckling ensued.

The libel also advanced other items of damage caused by injuring the hatch coamings, deck, etc., while the charterers were loading steel rails.

The last item of damage claimed was for the cost of replacing a bulkhead, which was proven on trial to have been taken down by the master in order to give the charterers the full reach of the hold.

The answer and cross-libel deny any maltreatment of the vessel by the charterers, assert that the mast fell because it was weak, and demand damages from the owner, because the buckling of the mast deprived the charterer of the ability to load a full cargo, and so use the whole of the ship that it had hired.

The main issue was as to the sufficiency of the mast. This the lower court decided in favor of the charterer. The other alleged matters of damage were disposed of, some in favor of one party, and some in favor of the other, and the matter sent to a commissioner. From the interlocutory decree the shipowner libelant appealed.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (Charles R. Hickox and Earl Appleman, both of New York City, of counsel), for appellant.

Burlingham, Veeder, Masten & Fearey, of New York City (Roscoe H. Hupper and William J. Dean, both of New York City, of counsel), for charterer.

Before HOUGH, MANTON, and HAND, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). Consideration of the apostles does not lead us to add much to the opinion of Ward, Circuit Judge, in the court below. The principal question is wholly of fact, viz.: Why did the mast break?

The original libel asserts the charterers, while "shifting a heavy log," did the work so badly as to break the mast; i. e., impose undue strain thereupon. There is no doubt that the immediate cause (that nearest in point of time) for the breaking was the catching of one log against another, as the charterers' stevedores were tiering or stowing in the hold the logs they had hoisted out of the water alongside. What happened is graphically told by the second mate, testifying for libelant:

"You see, the two winches were going full speed, and when one log butted up against the other *something had to go,* and, as none of the ship's gear went, the mast went."

The fault imposing responsibility for resulting loss must have been the act of charterer's agents (stevedores) in loading too heavy logs, in permitting the logs to jam, or in running the winches improperly, or the default of owner in failing to furnish a proper mast.

[1] As to the weight of the log, the direct evidence is too widely variant to be of value; but we believe, on the evidence of Garmey, an engineer expert for libelant, that the log was not unduly heavy, because no stevedores would have handled a comparatively heavy weight with a "single runner" fall, which was admittedly being used.

[2] As to the handling of the winches, which is now the main complaint of libelant, we agree with the lower court that the absence of all record of contemporaneous complaint in the log, and in the report of damage compiled by a Lloyd's surveyor, brought from Bluefields by the master immediately after disaster, is persuasive that the stevedoring was up to whatever was the local standard of excellence. We only add, on the subjects of winch management and stowage, a remark of the second mate, who seems to have supervised the handling of incoming cargo.

He was asked whether there was anything improper "in the way they were stowing the logs. A. No; nothing improper about the way they could stow them, unless they had more gear. * * * As far as I know, that is the only way they could stow them in the hatch. Q. Especially with the gear they had? A. Just exactly."

The gear was for the most part the ship's. What fully satisfies us that there was no dereliction of duty on the charterer's part is the report of the Lloyd's surveyor, who came 90 miles to examine the vessel while she still lay off Prinzapolca. This man concludes his report thus: "To the best of my knowledge and belief, in my opinion, most, if not all, of the above damage was caused from loading this present cargo of mahogany logs, owing to ship having to load out in open sea and weather being more or less boisterous and rough." And the master joined in and signed this document.

If at that time there had been any attribution of damage to careless winch running, it would have appeared in this report; and we think it an afterthought.

[3] The question remains whether the mast was weak. On this point we need not repeat what was said below. We add the following: The metal that broke had been in place nearly 20 years, and that is about the life of a mast. The mast, after the ship had been scuttled for some time, had been repaired, and indeed renewed, to within about one foot of the place that broke. It is impossible to resist the belief that corrosion by immersion was not sufficiently corrected.

[4] Further, we reject, as did the court below, the idea that, because the charter party limited the required capacity of the *ship's gear* to three tons, there was a corresponding limitation on the mast strength. Such a mast literally would not hold itself up in heavy weather. The owner was bound to furnish a mast reasonably strong for the contemplated ship's purposes. Nothing more definite can be found by implication (there is no other way) in this charter.

Libelant's expert witness thought that such a mast as described would endure a strain of 15 to 20 tons, or, said another witness, 9 to 12 tons. But the breaking strain of such a wire rope as was being used is between 11 and 12 tons. The rope held, and the mast went; the rolling of the ship, to be sure, especially accentuated strains on the mast, but the weight at the end of the fall was certainly insufficient to cause any danger to well-found apparatus. As the second mate said, something had to go; of course, the

weakest thing went, and it was the mast, which ought to have been the strongest.

We agree with the opinion below on all the other points there touched on.

Decree affirmed, with costs.