**GLASGOW SHIPOWNERS' CO., Limited, v. MUNSON S. S. LINE et al.**

No. 75.

District Court, E. D. Pennsylvania.

Sept. 10, 1930.

Rawle & Henderson, of Philadelphia, Pa., for libelant.

Biddle, Paul, Dawson & Yocum, of Philadelphia, Pa., for Munson S. S. Lines.

Acker, Manning & Brown, of Philadelphia, Pa., for Jarka Corporation.

DICKINSON, District Judge.

The claim is for the damaged mast of a vessel. There are two defendants. One is the Munson Line, which was the charterer of the vessel, the mast of which was damaged, and the other is the Jarka Corporation of Philadelphia, in whose use of the mast it was damaged. The latter company has been brought in to defend in relief of the Munson

Line under Admiralty Rule 56 (28 USCA § 723).

The outline facts are that the Munson Line hired of the libelant the use of the steamship Glasgow, with her captain and crew, and engaged the services of the Jarka Company as stevedores to load her. During this loading the mast buckled and was thus damaged. The charter party required the libelant to have the ship when delivered to the charterer in good condition "and in every way fitted for the service" required of her; to keep her in an efficient state of repair during her service; to provide, for the use of the charterer, gear for all derricks of a capacity to lift three tons and to maintain it; to provide also all necessary rigging, but "gear for heavier lifts shall be for Charterer's account." The charterers were in like manner required "to load, stow and trim the cargo at their expense under the supervision of the Captain," and to redeliver the vessel to the owners "in like good order and condition, ordinary wear and tear excepted." The cargo which the ship was to take on board consisted of steel tank material which was brought to the loading pier in cars. The method of loading followed was to pull the loaded cars by power supplied by the ship's wince operating through the gear supplied by the owners to a position opposite the hatch through which the cargo was to be admitted to the hold. The Jarka Company were merely the stevedores. They were independent contractors in full charge of the loading operation over which the Munson Company exercised no control. It was in the act of pulling a partly loaded car into position that the mast buckled. There is no evidence (except the buckling of the mast) that the strain exceeded that of a lift of three tons, and there is evidence that it was less than half that. A proper mast properly stayed would be, with good judgment, expected to stand the strain to which the mast was subjected when it buckled, if the wince was properly operated. No finding can be made from the evidence to what the buckling was due. Any cause which may be assigned is wholly speculative. The libelant reserved the right to "supervise" (through the captain of the ship) the loading. This power was not limited merely to the stowing and trimming. It extended to all features of the loading in so far as it affected the ship or her tackle.

The fact is found that the mast buckled and was thereby damaged. The further fact is found that this happened during the time the ship was being loaded by the stevedores of the charterer and when the cars referred to were being pulled by means of the ship's wince and tackle to a position from which the contents of the cars could conveniently be hoisted into No. 5 hatch.

The question is, Who is responsible for the damage done? The owners were bound to supply a ship with masts and tackle in good condition and of sufficient strength to withstand a strain equivalent to that of a lift of three and a half tons. They were further bound to keep the spars and rigging used in the loading in a fit condition to stand such a strain.

When the owners tendered the Glasgow as a ship meeting these requirements, and the charterers accepted her, a presumption arose that she was fit. On the other hand, this same presumption justified the charterers in using her with her masts and rigging for the purpose for which she was chartered (and thus presumed to be fit) up to the limit of use prescribed, but no more. There is no presumption, however, of abuse or excess of use, and the libelant has failed to produce evidence of either beyond what happened to the mast. This mere happening is not enough, for it does not declare the cause of the mishap. This exculpates the Jarka Company, defendant, from all blame, which would render the stevedores responsible. The question then recurs of the responsibility of the charterers. Their obligation is contractual. They agreed to return the ship to the owners in good condition, "ordinary wear and tear" alone excepted. Had there been a further exception of "accidents and other casualties," as we can make no finding of the cause, the damage would have been a happening, but, as the sole exception is the effect of "ordinary wear and tear," the question becomes whether one who has agreed to return what has been committed to his care in good order and condition is an insurer against mishaps in the sense attached to the word insurer in contracts not in terms of insurance. We must have in mind that this was not a demise of the vessel. It was merely a contract for her use as a carrier of cargo. She remained under the control of her captain and crew. The real contract was one by the owners to transport a cargo to be designated, provided, and loaded by the charterers. In this loading the hirers had the right to use the ship's tackle up to a limit of strain stated. If a strain calling for stronger tackle was to be applied, the charterers must supply it, or, at least, it was to be provided at their expense. So far as the

loading affected the ship or her tackle, it was to be under the supervision of the master. Beyond that the owners had no responsibility for it.

It has been urged upon us, and rulings have been cited in support of the proposition, that anything the master or crew did they did for the charterers and not the owners. This is in a sense true. There were, however, two things being done. There was the stevedoring work being done. This it was the duty of the charterers to do, and whoever did it so did it for them. Thus far the doctrine applies. There was also the ship with spars and tackle to be supplied. These it was the duty of the owners to provide and to keep in good condition. Whoever performed any part of this duty did it not for the charterers, but for the owners. The charterers had, as we have said, merely the right to the use of the ship, her spars, and tackle, and this use was under the supervision of the master, the representative of the owners. There would seem to be little, if any, difference between the doctrines of the common law and those of admiralty in such cases. In the case of a demise at common law a tenant who had contracted to return in good order and condition must make good his covenant. This makes him responsible for mishaps unless he has protected himself by excepting "accidents or other casualties." The same doctrine does not however apply to a contract to transport. A covenant to redeliver in this case has no real place any more than it would have in the case of a teamster who was hired to haul a load for another, the latter to load it. There has been nothing delivered, and there is nothing to redeliver. It is because of this that the phrase employed here is not a contract to redeliver, but is used to define the time during which the hire shall be paid. The real meaning is to declare when the hire payments shall cease.

█ It is further urged upon us that, even if the liability of the charterers is for negligence only, there is a presumption of negligence against the hirer which he must overcome by proof of due care. The analogy is that of the liability of a common carrier and of cases to which the doctrine of res ipsa loquitur applies. This doctrine, when it exists, grows out of a policy of the law and the adoption of a rule of evidence. In the case of common carriers, the imposition of prima facie liability, when damage or loss is sustained, is in pursuance of a policy of the law to protect the general public, whose patronage the common carrier invites. A somewhat similar responsibility is imposed upon innkeepers. In these cases, as in all cases of demises, the doctrine has the further support of the common-sense proposition that a carrier who is in possession and has the custody and care of what is being transported, whether common carrier or not, knows what happened in the case of damage or loss which the shipper does not know, and hence may fairly be made to assume the burden of disproving negligence. This is the real ipsa loquitur doctrine. The phrase is sometimes used to express a logical deduction. When anything is frequently and ordinarily done and may reasonably be expected to be done without loss or damage, if due care is used, the inference is a fair one that the mishap was due to negligence, unless the contrary is made to appear. It is in this sense that the mishap itself tells the story. It is clear no phase of this doctrine would apply to the case of a teamster who was himself transporting the thing carried and which had been loaded upon his truck under his own supervision. If he complains of injury to his horses or truck, he must prove that it was due to the negligence of the party sought to be charged therewith. The same is true of the owners of a vessel.

We repeat that there is no evidence of negligence here because the real cause of the buckling of this mast has not been made to appear. We have been favored with many ingenious and more or less plausible theories in explanation of this happening, but into these we will not go.

We hold that the only basis of liability here is the negligence of the stevedores, of which there is no evidence. It thus makes no difference whether their negligence may be imputed to the charterers. It is true that the stevedores are what is known as independent contractors, but it is likewise true that the duty of loading was upon the charterers, the responsibility for which cannot be passed on to others.

We are in accord with the libelant upon the proposition that, if the stevedores were negligent, a custom, even if there be one, in the local port to be negligent with impunity affords no escape from responsibility. Upon the question, however, of whether the tackle was used in a proper way, evidence of what is usual and customary has its value.

The conclusion reached is that the libelant has no cause of action and the respondents the right to judgment in their favor, with

costs, and an appropriate order or judgment may be entered. If the parties wish specific findings of fact or conclusions of law to be filed, they may submit requests which will be answered, the court reserving jurisdiction of the cause for this purpose.

The cases cited to us are too numerous for listing, but among them are the following: The conclusions reached are, we think, in accord with their trend. British v. Munson (D. C.) 149 F. 533; Sutcliff v. Seligman (C. C. A.) 121 F. 803; Sun v. Moore, 183 U. S. 642, 22 S. Ct. 240, 46 L. Ed. 366; Swenson v. Snare (C. C. A.) 160 F. 459; Bollman v. Tweedie (D. C.) 150 F. 434; Scottish v. Munson (C. C. A.) 10 F.(2d) 708; New Orleans v. U. S., 239 U. S. 202, 36 S. Ct. 76, 60 L. Ed. 227.