## THE GIBRALTAR.

**GLASGOW SHIPOWNERS CO., Limited, v. MUNSON S. S. LINE et al.**

**No. 4542.**

Circuit Court of Appeals, Third Circuit.

Oct. 2, 1931.

Rawle & Henderson, of Philadelphia, Pa., and Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Robert S. Erskine, of New York City, and Joseph W. Henderson, of Philadelphia, Pa., of counsel), for appellant.

Acker, Manning & Brown, of Philadelphia, Pa. (J. T. Manning, Jr., of Philadelphia, Pa., of counsel), for Jarka Corporation.

Biddle, Paul, Dawson & Yocum, of Philadelphia, Pa. (Howard H. Yocum, of Philadelphia, Pa., of counsel), for Munson S. S. Line.

Before WOOLLEY, DAVIS, and THOMPSON, Circuit Judges.

WOOLLEY, Circuit Judge.

When loading cargo aboard the Steamship "Gibraltar," the Jarka Corporation, stevedore of the Munson Steamship Line, the charterer, fastened the ship's gear to a draft of three freight cars lying on the dock and pulled them to a position abreast of a hatch for the purpose of transferring cargo from cars to ship. During this movement the mast to which the gear was attached buckled. The shipowner filed a libel against both parties to recover for the injury occasioned, it said, by the wrongful and negligent use of the gear. From the decree dismissing the libel the owner appealed. Glasgow Shipowners' Co. v. Munson S. S. Line et al. (D. C.) 44 F.(2d) 826.

Liability may depend on a number of things but primarily on the contract between the principal parties. The charter by its terms is not a demise; nor is it a contract of affreightment. Being the hire of the ship at a named rate per ton of deadweight capacity for a named period, we regard it

a time charter. Its provisions pertinent to this case are that the owner engaged to make the ship "ready to receive cargo" and "in every way fitted for the service," and put her whole reach for cargo purposes at the charterer's disposal. The owner undertook "to keep the steamer in a thoroughly efficient state in hull, machinery and equipment for and during the service" and provide and maintain gear with the necessary winches, ropes, falls, slings and blocks, capable of handling lifts up to three tons, beyond which lifts were for the charterer's account. The charterer was required "to load, stow and trim the cargo at its expense under the supervision of the captain," and return the ship to the owner "in like good order and condition, ordinary wear and tear excepted."

Thus at the beginning the parties defined their engagements—the owner to man the ship and supply her with cargo equipment "efficient * * * for * * * the service," yet retain her for purposes of navigation and supervision of cargo movement; the charterer to have the reach of the ship for loading, carrying and discharging cargo with the duty to return her "in like good order and condition." Against this contract are the outstanding facts that the owner supplied the equipment and supervised the loading of cargo and the charterer returned the ship with a buckled mast.

Whose was the fault?

The answer to this question depends ultimately on the answer to the question, why did the mast buckle? It is certain the mast buckled because it was too weak for the authorized strain of three tons, or, being strong enough, because it was negligently subjected to an excess strain or the permitted strain was negligently applied.

Which was it?

■■ No one has answered this question because no one knows. At the trial the owner relied on the apparent good condition of the mast when the ship was delivered as prima facie evidence that the mast was sound. The charterer produced evidence that on subsequent examination the mast showed it was weak when the reach of the ship was delivered to it. In this state of the case the parties resorted to the ever recurring question of burden of proof, the libellant insisting, and the respondents objecting, that the issue is controlled by the rule in case of a demise, where (the ship at the time of the injury having been in the exclusive possession of the charterer) after the owner's prima facie case of injury, the burden of going for-

ward to show how the injury occurred and also to show it was not through his negligence rests on the charterer. Swenson v. Snare & Triest Co. (C. C. A.) 160 F. 459; Schoonmaker Conners Co. v. Lambert Transp. Co. (C. C. A.) 268 F. 102; Tomkins Cove Stone Co. v. Bleakley Transp. Co. (C. C. A.) 40 F.(2d) 249, 251. But that rule cannot apply under this particular time charter for several reasons, the controlling ones being the owner's engagement to supply efficient equipment, including the mast, and its reserved right to supervise the loading of cargo while the ship was partly in its possession. So the question inevitably gets back to whether the owner has proved that it performed its covenant to supply a good mast in the first place against the respondents' evidence that the mast was weak and defective when turned over to it for cargo lifting. If the mast was weak—weak enough to buckle under the permitted strain —the owner breached its covenant and the charterer was not bound to return in good condition a mast received in bad condition.

The issue whether the mast was improperly rigged in not having a back stay does not, we think, affect the central issue as to the mast's condition, for, if good, it did not need a back stay and, if bad, the owner was at fault anyway.

■ Failing affirmatively to prove negligence on the part of the charterer as it had averred in its libel, the owner next took the position that the use of the mast and gear for pulling cargo cars, instead of lifting cargo, was a deviation from the use permitted by the charter (by analogy to a deviation from a prescribed voyage) and therefore the respondents are liable for all damage, irrespective of their negligence.

Whether that is law in the abstract (on which we express no opinion) it is not the law of this case if the charter and the facts take it outside of such a rule. To determine whether that is so, we shall go into the car and cargo movement at some length.

The cargo was brought to the side of the ship in railroad cars. When it became necessary to move up a car to a particular hatch, the stevedore, as in this instance, made fast to the car a ⅝ inch bull wire which was carried through a snatch block fastened to a bollard on the pier. The bull wire was then carried through a hawser opening or mooring pipe in the side of the ship approximately abreast of the snatch block, and its inner end was fastened to the hook on the fall on the port cargo boom

at the hatch, which in turn was connected with the winch aboard ship. This method of pulling cars in place for the purpose of taking on cargo was during the day objected to by the captain under whose supervision, according to the charter, the cargo was being loaded, but, doing nothing more than casually object, he did not stop the practice, as under the charter he had power to do.

When the cargo was about loaded, three cars coupled together remained on the track, in one of which was a small quantity of cargo. The other two were empty. In order to move the car to the hatch the stevedore made fast the bull wire to the first one. The track was level and the rails dry. The total weight of the cars was sixty-seven tons. The cargo contained in one of them was not more than three tons. The total weight therefore was not in excess of seventy tons. On signal to the winchman, the cars were moved a distance of about twenty-five or thirty feet. Then it was discovered that the mast had buckled.

This movement was made under the eye of the second officer of the ship who was standing on the after part of the bridge deck just over the hatch. The captain, apparently, was absent. It is fair to assume that the second officer was taking his place in supervising the loading. At all events neither the captain nor the second officer objected to the movement. Supervision of loading was a right reserved by the owner for the protection of its equipment. For this purpose the captain was in the owner's service and was its agent.

Out of this movement there arose not merely a question of misuse of the gear by the charterer's stevedore (in moving cargo cars instead of lifting cargo) with liability for the consequences irrespective of negligence but two questions of actual negligence by the stevedore in the manner in which it used the gear. One is whether it subjected the gear to a strain greater than that of a three ton lift permitted by the charter; the other, if not, whether it suddenly and therefore negligently applied the strain. On these points the owner introduced practically no evidence but insisted on the charterer proving lack of negligence on its part. The charterer, assuming this burden, produced evidence on both of these questions. The evidence as to the first question was that the strain was less than that of a three ton lift on a showing that a draw bar pull of forty pounds per ton was, in railroad experience, sufficient to start cars of their weight; that after they were started a draw bar pull of twenty pounds per ton would keep them moving and that the pull

necessary to start the cars, with their load, was therefore 2,800 pounds.

Continuing, it was testified that the pull of forty pounds per ton to start the cars was increased five per cent. by friction of the bull wire at the snatch block and twenty per cent. by friction in the mooring pipe in the side of the ship, under the conditions attending the movement of the cars; and that the load at the chock on the fall, incident to the starting of the cars, was therefore 3,500 pounds, or 1.5625 tons instead of the three tons permitted by the charter.

On the second question of negligent operation of the gear the charterer introduced evidence tending to prove that before the cars were moved the hatch tender made sure the brakes were all right, not by personal examination but by inquiring of the men in the cars; that the winch started slowly without any jerk, the slack in the line was taken up carefully and the cars moved steadily. Evidently the brakes were off; otherwise the winch could not have pulled the cars twenty-five or thirty feet. In regard to the character of the strain, the second officer of the ship, who saw the movement, testified that the lift was a straight lift similar to that of lifting a draft of cargo from the dock, as it must have been in view of the arrangement of the gear.

In the absence of evidence of negligence and on this evidence of due care, the respondents have acquitted themselves of the charge of negligence in the two particulars suggested unless we adopt the doctrine of res ipsa loquitur and hold that the accident itself tells the respondents' negligence, whether in exceeding the permitted strain or in applying it. But clearly this doctrine cannot be invoked in this accident without ignoring the first and central question in the case, namely, whether the mast which the owner engaged to deliver, capable of hoisting a three ton weight, was weak or strong. If weak to the extent of not standing the permitted strain, that was negligence on the part of the owner which, conceivably, might have been the sole and proximate cause of the accident. With that factual possibility and its legal consequences outstanding, the issue of negligence cannot be restricted to or be decided by the presumption of the doctrine.

■ Finally, the respondents deny liability because of a custom which they say prevailed in the local port of hauling cargo cars to the ship's side by ship gear. Here again the question gets back to the owner's engagement to supply a mast strong enough to stand up against the strain of an agreed

load and to the respondents' duty to exercise due care with respect to it within the strain limits of the charter. No matter what the custom may be, it will not relieve either party from its legal responsibility in these regards. After all, the accident happened not because of a custom, or of a mere movement under it which the owner's captain, supervising the loading, could have stopped, but because of negligence of someone. As the evidence does not show it was negligence of the respondents, the decree dismissing the libel is

Affirmed.