## THE G. G. POST.

### W. E. HEDGER TRANSP. CO. v. COLUMBIA TRANSP. CO. et al.

#### No. 2155.

District Court, W. D. New York.

Aug. 3, 1945.

Richards & Coffey, by Laurence E. Coffey, all of Buffalo, N. Y., and Platow & Lyon, by Edward F. Platow, all of New York City, for libellant.

Arthur E. Otten, of Buffalo, N. Y., and Johnson & Branand and Gilbert R. Johnson, all of Cleveland, Ohio, for claimant and respondent.

KNIGHT, District Judge.

Libellant sues to recover damages claimed to have been sustained at Buffalo, Erie County, New York, September 24, 1943, by reason of negligence in the unloading of pig iron from the steamer G. G. Post, owned by the respondent, the Columbia Transportation Company, onto the libellant's barges Broadway and Earl F. Foster.

The claimant had agreed with the American Steel and Wire Company to transport the pig iron from Duluth, Minn., to Buffalo, New York, and libellant engaged with the latter company to transport the same from Buffalo via such barges.

The Post is of steel construction and of the type of ship known as self-unloader, in which the unloading is done by means of a crane or cranes on the deck. The Post is equipped with two cranes mounted on a circular tract, so that the crane can revolve for a full 360 degrees, and fitted with a long boom, each crane having free swinging magnets 77 inches in diameter, 15 inches high, each weighing about 8 tons, with capacity to carry about 11 or 12 tons of pig iron suspended by a cable on a boom. The magnets are raised, lowered and otherwise operated by machinery by a wheelsman or mate in a cab built in the structure of the crane. In the method of the operation of the crane, the magnet is dropped into the hold of the vessel being unloaded; the magnet attracts the load; the load is lifted and swung into a position in which it is deposited in the barge or vessel alongside. So-called crane No. 1 was employed in the loading of both barges.

The Earl F. Foster is a barge 117 feet long, 30.9 feet beam, and 12.9 feet deep with seven hatch openings of about 12 feet between beams. The cargo hold flooring in the Foster is three by twelve fir or pine, and the bottom planks 4" by 10". The keelsons run fore and aft, enclosed between the floor of the cargo compartment and the bottom planking. The center keelson is 12" by 12", and there are ten sister keelsons each 6" by 12" spaced evenly between the center keelson and either side of the barge. The bottom planks run athwartship the barge and are spiked to the underside of the keelson.

The barge Broadway is 111.3 feet long, 30.5 feet wide, and 12.5 feet deep.

Besides the men who were regularly employed on the Post, respondent for the purpose of expediting the work engaged several stevedores to assist in the unloading, and one of these was a so-called signalman whose duty it was to direct the unloading. While the unloading of the Foster was going on, and when about 70 tons of pig had been placed in two of the aft hatches, it was discovered that water had risen in the cargo space for a height of several feet, and an employee of the libellant called libellant's manager of its fleet of barges then at the dock, and at the latter's suggestion, pig to the weight of about 25 tons was put in No. 1 hatch, for the purpose of trying to even the barge up, but this did not relieve the condition. Water in the cargo hold continued to rise to a height of about 6 feet at the stern end and about 2 or 3 feet at the bow. Pumps were employed to remove the water, and the pig was thereafter transferred back to the Post by the use of both cranes and magnets. It was then found a steel rail about 3 feet in length was stuck in a vertical position in the flooring of the barge, and later investigation revealed that it had penetrated through the bottom planking about 4 inches. This penetration was between the fifth and sixth cargo hold stanchions, between the first and second keelsons to port of the center keelson. Later examination of the barge disclosed that one bottom plank under No. 4 cargo hold was down 2 inches from the center line and for an athwartship distance of 10 feet, and one bottom plank under No. 5 cargo hold stanchion was sprung down 1 inch at the center line and for an athwartship distance of 6 feet, and the caulking in the vicinity of these planks had been opened up. A piece of pig was found imbedded in the floor at a point between No. 3 and No. 4 keelsons to port of the center keelson between No. 4 and No. 5 stanchions. The hanging knees on No. 5 and No. 6 cargo holds under the main beams, port side, were found to have been pulled down and the fastening started. No. 8 cargo hold stanchion was split for a distance of about 6 feet, and the barge was discovered to be hogged in the center. The "bilge" ceiling (or floor) was broken to an extent requiring replacement of 384 lineal feet. The foregoing statement is substantially uncontradicted.

The evidence given by several witnesses called by the libellant was to the effect that the interior of the cargo hold of the Foster had been examined by them shortly prior to the loading in question, that the holds had been swept clean; there was no material break in them; that braces between the stanchions through the center of the barge and between the center stanchions and the king posts had been installed shortly before this loading for the purpose of strengthening the barge for carrying pig, and further that the barge did not leak before the loading in question. The Foster had carried several cargoes of pig prior to this time during the 1943 season. Its last cargo before the day in question had been "Bauxite" ore in the form of a powder.

Surveyors called by the respondents, one representing the insurance underwriters and the other representing the respondents, testified that the center keelson under the

center post was rotted to a depth of 8 inches, that the stanchions had settled in this keelson 1 inch, that one of the sister keelsons showed a rotted condition, that several king posts at the sides of the cargo hold showed rot, and some of the knees, other than those above mentioned, were in the same condition, that caulking was loose on the side of the interior of the barge, and that there were numerous holes in the floor of the cargo hold. It is undenied that the butts of the deck planking at the stern end of the barge had been pulled away from the covering board about 2 inches in the center and about 1½ inches at each side, and had been filled and caulked in, and further that this was an old separation. One of the surveyors called by the respondents in his report stated that the beam knees No. 4, 5 and 6 on the port side were down and "there were indications that that was a fresh separation." This statement agrees with the report and testimony of the libellant's surveyor.

It is admitted that damage was done through the unloading. By reason of the location and the position of the iron rail in the floor and bottom, it is reasonably concluded that the iron rail was unloaded with the pig. The position in which it was found, penetrating as it did, both the floor and the bottom planking, is sufficient proof that it was either dropped with great force from the magnet, or that after being dropped it was driven through the floor and the bottom plank by the weight of the load of the magnet dropped on it. Clearly this penetration was the first source of leakage and primal cause of damage. As respondents' captain said: "There's your trouble."

It is claimed that in the loading of the Broadway, which preceded the loading of the Foster, the magnet of the crane hit the A frames of the barge, struck under the deck and swung against the cabin, breaking partitions and a window glass. The report of the captain of the Broadway said "damage done to 'A' frame. Posts 1, 3, 4, 6 bent over. Forward side and center of Captain's cabin bent in and lining broken and one small window broken." The "A" frame is a superstructure on the top of the hatch kams 4 or 5 feet in height. The disagreement as to the damage on the Broadway is as to the separation of the beams and knees. There is no question that the beams and knees showed separation after the loading, but when this condition was caused is disputed. Witnesses called by

respondent swear that the separation showed before the loading and two of the surveyors said the condition found disclosed that this had been caused earlier. This is directly contradicted by several of libellant's witnesses. There is testimony as to other conditions in the Broadway directed to show that the barge was unseaworthy, but this testimony is disputed by libellant's barge captains and others employed on the barges. Any damage done to this barge did not prevent the loading and her completing her trip. The Broadway was built in 1915 and was acquired by libellant in 1938. From 1938 through 1942 she carried upwards of 35 cargoes of heavy loads, including numerous loads of pig. Her immediately preceding cargo, as well as several others, had been bauxite.

The clearance of the hatch beams and the magnet was only about 10 inches on each side. This appears to be small when considering the nature of the material loaded and the means by which it was to be unloaded. Libellant, as well as respondent, was aware of the condition. There normally might be expected to be some damage under the existing conditions. The extent of these, aside from any separation of the beams, was little.

It was the duty of the libellant to provide seaworthy barges: barges that were "staunch and strong and fit to carry the intended load." The respondents cite numerous cases, including The Regulus, D.C., 18 F. 380, The Reba, D.C., 22 F. 546, The Syracuse, D.C., 18 F. 828, The Gibraltar, 3 Cir., 52 F.2d 787, 1931 A.M.C. 1757, which, among others, support this statement of the rule. No question can arise as respects the rule, but naturally each vessel considered presents different conditions of construction.

The libellant assumed the risk of the ordinary wear and tear arising out of the loading of the material in question. The Lake Galewood, D.C., 1932 A.M.C. 1461, affirmed Gorman Leonard Coal Co. v. Peninsular State S. S. Corp., 1 Cir., 66 F.2d 83, 1933 A.M.C. 1179; New York, N. H. & H. R. Co. v. Delaware L. & W. R. Co., 2 Cir., 23 F.2d 487. However, as found in the instance of the one barge, Foster, the damages herein found done cannot be so classified. It does appear that both barges were of considerable age. Age alone, within the limits shown here, is not sufficient to sustain the claim that the

barges were unseaworthy. Age is properly an element to be considered in this connection and testimony should be carefully scrutinized with this respect in mind. The Syracuse, supra; New York, N. H. & H. R. Co. v. Delaware, L. & W. R. Co., supra; The Gibraltar, 3 Cir., 52 F.2d 787. In the case of both barges certain repairs shown in evidence had been made in years immediately preceding the time in question. More extensive repairs were made on the barge Foster. It was drydocked in 1942 and upwards of $9,000 expended on repairs. A respondents' witness said the barge was in good condition forward and aft. There is evidence of some weakness in the Foster, but the strength of the structure of this barge to carry the intended load was not affected by this. There is little attempt to show that the Broadway was unseaworthy. It carried and delivered its load of pig. So far as is seen, any claim of unseaworthiness can only be based on the hatches being only 8 feet in width and that the separation of the beams and knees showed that this condition was of long standing. Upon all the facts proved the Court finds that the Foster was seaworthy within the aforesaid rule of determination. A decision in this respect as regards the Broadway is not necessary.

■■ Finding that the Foster was seaworthy, the next question is whether respondents are liable for the damage flowing therefrom. Numerous cases have been cited by the respondents to sustain the position that the duty rested upon the bargee to unload the pig and to see that it was properly done. Most of the cases so cited are those which arise out of instances where the vessels being loaded were under charter. Such are The Regulus, supra; The Gibraltar, supra; Bartley v. Borough Development Co., D.C., 214 F. 296; Munson S. S. Line v. Glasgow Navigation Co., 2 Cir., 235 F. 64. These and other cases cited by the respondents do not seem in point. Irrespective of any obligation resting on the respondent arising under the provisions of the tariff filed with the Interstate Commerce Commission and irrespective of any contractual relation between the libellant and the shipper, the respondents are liable here for the negligent acts of its employees. The respondent, under its contract with the shipper, was required to discharge the cargo of the barges. It assumed to and did this with the Post's complement of men, together with stevedores employed by and paid by it. It is uncontradicted that these stevedores were employed to hasten the unloading. Their work in unloading in connection with the work of the ship's men was in the nature of the work ordinarily done by stevedores. In such capacity the stevedore is ordinarily employed as having special qualifications as stowers. They so acted in the instant case. The language of the Court in Hastorf Contracting Co. v. Ocean Transportation Corp., 2 Cir., 4 F.2d 583, is specially in point here. There the question of the duties of stevedores are clearly expressed. Judge Hand, writing the opinion, and this was a case in which a party sought to be relieved from the responsibility of stevedores in their operations, in part said: "Having undertaken to stow the barge, the stevedores are primarily responsible, regardless of contract, (citing cases). * * * It makes no difference that they were not bound to lade the barge, or even that they did it as a favor to the respondent. That is no excuse for the direct injury which they did. * * * the stevedores should have had nothing to learn from the bargee if they knew their business. On the other hand, the bargee ought not, I think, be asked to know such things. * * * What the bargee must do alone, what the stevedores will not know as part of their calling, in what respects the barge is peculiar in her class, with such things the bargee is charged. But I can see no reason in requiring the owner to have at hand a bargee who would be able to tell others how to do what he may assume they know already, * * *." The language of this Court in Smith v. Nicholson Transit Co., D.C., 39 F.Supp. 795, and Seaboard S. & G. Corp. v. James Hughes, Inc., D.C., 56 F.Supp. 468, 1944 A.M.C. 929, is also directly in point. So it seems that here the duty did not rest upon the barge's captain to see that the load was properly stowed. We reiterate that the sole question here is whether the employees of the claimant were negligent. The act of libellant's manager done in an emergency does not lessen respondent's liability. The Arkansan, 9 Cir., 112 F.2d 230; Vigil v. Atchison, T. & S. F. R. Co., 10 Cir., 261 F. 313; and many cases therein cited. Further, this did not contribute to the damage.

■ As to the Broadway, it is found that the respondent through the operation of a crane bent over the posts 1, 3, 4 and 6 above the deck beams, the A frame, the

strong backs for hatch covers and broke the forward side of the captain's cabin, but such damages were only such as are rightly classified as ordinary "wear and tear," for which respondents are not liable. There is evidence that the beams and knees on this barge were lifted by the Post's magnet. It does appear that they had been lifted out of place, but there is evidence that this was an old damage. It seems that liability of the respondent in respect to this has not been shown by a preponderance of evidence. Gulf Oil Corp. v. The Baltimore, D.C., 47 F.Supp. 770, affirmed, 2 Cir., 142 F.2d 557.

As to the Foster, the conclusion seems inescapable that the magnet was operated in a careless and negligent manner. There can be little question but that the iron rail was dropped with the magnet load. With proper care the presence of this rail would have been discovered. It was either dropped from the magnet at too great a height, or else it was driven through the floor and beam by the dropping of loads of pig on it at unreasonable heights. The extensive damage to No. 8 stanchion shows this stanchion was struck with considerable force by the magnet, or else this resulted from the striking of the magnet at other points about the hatch.

It is uncontradicted that the magnet at times struck the beams. The pig imbedded in the hatch floor was visible evidence that the pig was dropped from too great a height. The stanchions are strength members, but the stanchion at the forward end of No. 4 hatch was only one of eight stanchions. While the barge bottom was found to be dropped down below No. 4 hatch, the same was true as to No. 5 hatch. This goes to show that the condition of the keelson below No. 4 stanchion was not the cause of any "hogging." Assuming that the keelson below No. 4 stanchion was soft or rotten to a depth of 8 inches, the remaining sound part would hold the stanchion in place under ordinary strain because the "U" strap would be supported by the sound portion of the keelson. As stated, admittedly 384 feet of "bilge" ceiling replacement is required.

Admittedly the barge was "hogged." Whether this condition had been pre-existent to the date in question or was caused by the acts of respondents' employees is the question. It seems to the court that the negligent operation of the crane and magnet caused a severe strain on the barge and this was sufficient to and did cause the "hogging."

The foregoing and other evidence leads to the conclusion that the barge Foster was damaged by the negligence of the employees of the respondents and that the respondents are liable to libellant for and on account of the damages hereinafter specified.

 There seems to be some dispute between counsel as to what matters can be determined by a Commissioner, if one were appointed. The duties of the Commissioner should be clearly pointed out. The court has heard the testimony with reference to the particular damages claimed to have been done, and is in a position to state what it believes the nature of the damages is. The Commissioner is to determine and evaluate such damages. The Russell No. 3, D.C., 7 F.Supp. 812, and cases there cited.

The Court finds:

(1.) That the respondents are not liable for the damages done to the captain's cabin and the "A" frame posts, 1, 3, 4 and 6, and the separation of the beams of the Broadway.

(2.) That respondents are liable for the damage done to and resulting from (a) the penetration of the floor and the bottom of the barge by the iron rail; (b) penetration of the floor of the hatches by the pig; (c) injury to the bilge ceiling; (d) displacement of the bottom of the barge under hatches 4 and 5 and separation of beam knees 4, 5 and 6 on the port side; and (e) the "hogging" of the barge Foster. In certain instances there will be over-lapping in repairing and this is to be considered in the assessment of damages.

(3.) With respect to any other damages claimed by libellant, the Court finds that they can not be sustained.

(4.) Thomas C. Burke, of Buffalo, New York, is hereby appointed Commissioner to compute and assess the damages done in the foregoing respects by the respondents, all subject to confirmation by this court.