See also, D.C., 204 F.Supp. 353.

**MORAN TOWING CORPORATION,**
Libellant,

v.

**M. A. GAMMINO CONSTRUCTION COMPANY,** Respondent.

**UNITED STATES** of America for the Use and Benefit of **MORAN TOWING CORPORATION,** Plaintiff,

v.

**HARTFORD ACCIDENT & INDEMNITY COMPANY,** Defendant.

Admiralty No. 1824.

Civ. A. No. 2868.

United States District Court
D. Rhode Island.

Aug. 12, 1965.

Benjamin A. Smith, of Tillinghast, Collins & Tanner, Providence, R. I., Eugene Underwood, and Robert B. Pohl, of Burlingham, Underwood, Barron, Wright & White, New York City, for libellants and plaintiff.

Claude R. Branch, Providence, and Bigham, Englar, Jones & Houston, Donald M. Waesche, Jr. and Louis P. Sheinbaum, New York City, for respondent.

Edwards & Angell, Edward M. Hindle, Ronald R. Lagueux, Richard M. Borod, Providence, R. I., for Hartford Accident & Indem. Co.

DAY, District Judge.

These cases, involving common questions of law and fact, were consolidated for trial and were tried to the Court without a jury. In Admiralty No. 1824, the libellant Moran Towing Corporation (hereinafter called "Moran") seeks to recover for damages allegedly caused to its dump scows, Moran 104 and Moran 106 and its tug, the Julia C. Moran, as the result of the alleged negligence and breach of contract by the respondent M. A. Gammino Construction Company (hereinafter called "Gammino"). It seeks recovery of the sum of $352,238.91 for alleged damages (including loss of use) to said scows, and the sum of $5,-127.68 for alleged damages (including loss of use) to said tug.

Civil Action No. 2868 is an action brought under the provisions of 40 U.S. C.A. § 270b (the Miller Act, so-called) for the use of Moran against Hartford Accident & Indemnity Company (hereinafter called "Hartford") as the surety on a payment bond furnished by Gammino pursuant to its contract with the United States of America for the construction of a breakwater at Newport, Rhode Island. In this action Moran seeks judgment in its favor for like amounts against the surety. It claims that said damages to its scows and tug were caused by Gammino's breach of their contract and that the labor and material required to repair said damages were labor and material furnished by it in the prosecution of the work provided for in Gammino's contract for the construction of said breakwater.

The trial of these cases consumed many days and produced a voluminous record, including many exhibits. From the evidence adduced during said trial it appears that on February 5, 1960 Gammino entered into a contract with the United States of America to construct a breakwater at the United States Naval Base at Newport, Rhode Island, for the sum of $3,790,000. Pursuant to said contract, Gammino, as principal, and Hartford, as surety, executed and furnished to the United States of America a payment bond in the penal sum of $1,516,000, dated February 5, 1960, and conforming to the requirements of said Miller Act.

Subsequently, on or about April 21, 1960, Moran and Gammino entered into a written agreement in the form of a letter, prepared by Moran, addressed to Gammino, and then approved and accepted in writing by Gammino, under which Moran agreed to furnish the services of said steel bottom scows, Moran 104 and Moran 106, and a seagoing tug to transport breakwater stone as required under Gammino's contract with the United States of America from a loading dock at Tiverton, Rhode Island, to said

breakwater site. The quantity of breakwater stone to be transported was estimated by the parties to be approximately 800,000 net tons.

Gammino agreed to pay for the services of said dump scows and tug at the rate of forty-three (43) cents per net ton of stone transported (determined by Moran on the basis of transporting 96,000 net tons each two week period) with a specified minimum charge of $41,280. for each two week period that the scows and tug were used.

Other pertinent provisions of said agreement were as follows:

"1. You will provide a suitable loading berth with a minimum depth of water of 18 feet at mean low water, and with sufficient length for two (2) dump scows to lay safely alongside the dock whether light or loaded, and with sufficient depth of water to navigate between the regular channel and the loading berth.

"2. You are to provide facilities capable of loading the scows with 8,000 net tons per 24 hour period including time necessary for shifting at the loading berth. You are to properly load each scow to a draft determined and directed by Moran's representative who will be present during loading operation. We estimate that the two (2) dump scows can transport a minimum of 8,000 net tons per 24-hour period, weather permitting, based on 4-dumper loads of 2,000 tons each and a maximum in excess of 10,000 tons.

"3. The stone to be transported hereunder shall consist of quarry run stone 50% of a size 200 lbs. per piece or less, 45% of a size from 200 lbs. to 1000 lbs. per piece, and the remaining 5% of a size not in excess of 1500 lbs. per piece, provided, however, that if it is demonstrated through experience that pieces weighing more than 1000 lbs. are causing damage to the scows or interfering with the dumping process, then and in either event the limitations as to weight per piece shall be 1000 lbs.

"4. At the breakwater site, you shall arrange the operation so that the dump scows may be promptly unloaded and you shall provide a barge, properly moored at the dumping site, to which the dump scows shall be made fast by you prior to dumping. The captain of each dump scow shall release the load under your direction, and as your Agent. We shall not be responsible in any way whatsoever for the proper positioning of the dump scow prior to dumping. Immediately after the dumping has been accomplished, your personnel shall release the dump scow and the tug shall proceed to the loading berth without delay.

"5. It is estimated that each scow carrying a minimum of 2000 net tons will be drawing 15′ of water and an additional 10′ under the scow is required for the free dumping of the load. Accordingly no dumping will be done in any areas having less than 25′ depth of water except that dumping in areas having less than 25′ depth of water may be accomplished from the middle pocket of the scow (after all pockets except the middle pocket have been dumped) in areas having less than 25′ depth of water provided there is at least 10′ of water under the scow in such area and also provided such partial dumping does not result in substantial delay at the breakwater site.

"9. We shall be responsible for all ordinary wear and tear to our vessel equipment due to the nature of the material to be transported, but you shall be responsible for any damage to our vessel equipment due to your negligence, or for any damage to our vessel equipment whether or not due to your negligence that may be occasioned by loading or unloading of pieces weighing in excess of 1000 lbs. per piece."

Pursuant to this agreement, Moran furnished said dump scows, Moran 104 and Moran 106, and the tug Julia C. Moran, for the transportation of said stone from a loading berth at Tiverton, Rhode Island, to said breakwater site during the period beginning June 22, 1960 and ending December 3, 1960. The scows had been constructed in 1955 at a cost of approximately $272,000 each. Between March, 1955 and June, 1960, they had been used at the Moran dump board in the City of New York where they were loaded with waste materials of all types, such as rock and earth excavations, broken concrete, etc., for disposal at sea. At this board they were loaded from trucks which dumped their loads over the edge of the dump board a distance of between 25 and 30 feet into the hoppers of the scows. Each of the scows is 168 feet long, 43 feet wide and 15½ feet deep, measured from the top of the deck to the underside of the bottom. Each has seven hoppers or pockets numbered 1 to 7, from bow to stern. Each hopper is 33 feet wide at the top, approximately 11 feet wide where the slope plates in each hopper meet the well plates, and has a fore and aft length of approximately 18 feet at the top.

Each hopper contains two sets of slope plates, two sets of well plates, two hopper doors at the bottom thereof, two sets of cables and two sets of chain guards. Around the hoppers is a fence-like structure, called the coaming, which extends up from the deck a distance of approximately 3 feet. The slope plates are steel plates having a thicknness of ¾ of an inch, extending downward at an angle from the deck at the bottom of said coaming to top of the well plate, so-called. The well plate is a verticle steel plate extending from the bottom of the slope plate to the doors of the hopper, a depth of about 3 feet. In each hopper there was a pair of hinged doors constructed of 12 inch by 12 inch logs bound together by heavy steel straps. Each door was 18 feet long and 5½ feet wide, so that the bottom of each pocket is 11 feet wide. The doors were suspended on the

outboard side by a link to a hinge attached to the foot of the slope plate. When they were released they swung downward and allowed the contents of the hoppers to fall into the sea and were operated by a hydraulic system by means of cables attached to each door.

Each scow has two types of bulkheads. The fore and after end bulkheads, located at the forward end of the No. 1 hopper and the after end of No. 7 hopper are flat steel plates having a thickness of ½ inch, and the intermediate bulkheads are flat steel plates with reversed angles on each side of the plate separating the hoppers. On top of each of the intermediate bulkheads are pipe guards which are heavy round steel pipe having a thickness of ½ inch and an inside diameter of 12 inches.

Gammino's contract with the United States provided for the construction of a breakwater site consisting of three classes of stone, viz: Class A stone had a minimum weight of 6 tons with no maximum; Class B stone had a minimum weight of 1 ton with at least 50 per cent of a minimum weight of 3 tons with no maximum; Class C stone consisted of stones, 50 per cent of which were to weigh more than 200 pounds, 45 per cent below 200 pounds, and 5 per cent quarry chips, with no maximum.

Gammino obtained its rock for construction of said breakwater by blasting in a quarry located in Tiverton. Blasting operations began in April, 1960. Initial blasting operations produced primarily Class C stone, so that the transportation provided for by Moran's contract with Gammino could proceed without interruption. Rock weighing up to 800 pounds was stockpiled as Class C stone; that weighing over 800 pounds and up to 2000 pounds was stockpiled as Class B stone. After completion of loading facilities located on the easterly shore of the Sakonnet River in Tiverton, several miles from said quarry, and the arrival of said scows and tug, stone was transported by truck to the loading berth. [1] After being loaded, each truck proceeded to a weighing station where the weight of each truck load

was determined and recorded by representatives of Moran and Gammino.

The facilities at the loading berth consisted of a pier constructed of clusters of piles imbedded in the shore to which the scows were tied by steel cables while being loaded; a conveyor system with hopper into which trucks coming from the quarry dumped their loads of rock; and a stiff leg crane or derrick to which was attached a skip box (a truck body adapted for use in loading the scows) which was primarily used for preloading the hoppers of the scows. These facilities were constructed by Gammino after discussions with Eugene F. Moran, vice-president of Moran, and approved by him. The conveyor consisted of an endless steel belt installed at the bottom of the hopper into which the loads of said trucks were dumped. This belt carried the rock from the hopper to the end of the conveyor which was about 3 feet short of the center line of the scow being loaded, and between 25 and 30 feet above the surface of the water.

The skip box was a 15 ton Euclid truck body approximately 14 feet long, 10 feet wide and 3 feet deep with a capacity of 15 tons. It was affixed to the cables of the stiff leg derrick, and had two saddles, one at the forward end, the other at the rear end. A line ran from each saddle to separate drums to permit the raising or lowering of each end of the skip box independently. A tag line was attached to the forward end of the skip box to prevent it from spinning and extended to a spring reel attached to the boom.

While the contract between Moran and Gammino contained no requirement for preloading the hoppers, after its execution Moran advised Gammino that it was essential that each of the hoppers of the scows be preloaded with at least 20 tons of quarry fines and dirt to provide a cushion for the free falling rocks from the conveyor and to lessen wear and tear therefrom. In the beginning this preloading was done by a tractor crane with a clam shell bucket. This method proved to be too slow and was unsatisfactory to

Moran, and after three or four days, was discontinued. Thereafter Moran permitted preloading directly from the conveyor. This method was employed until late in July when the stiff leg derrick and skip box with Moran's approval were placed in operation and were used thereafter for preloading until completion of the transportation of the rock in December, 1960. The skip box was loaded directly from Gammino's trucks. The operator of the derrick then would swing the skip box out over the particular hopper to be preloaded, lower it as close to the doors of said hopper as possible, raise the back line so that the skip box was tilted and its load fell out from the front thereof into said hopper. It is clear that when the skip box was being lowered into a hopper the motions of the skip box, on occasions, resulted in its striking various parts of the scow, including the slope plates, pipe guards, chain guards, coamings and bulkheads.

When a scow was loaded it was then towed by the Moran tug from the loading berth a distance of approximately 10 miles to the breakwater site where it was dumped. The center line of the breakwater was designated by a row of pilings. Initially, the scows were positioned over the breakwater site by means of a measuring wire and visual sighting along the row of pilings. From July 8th until completion of the contract, Gammino stationed a steel car float 250 feet long and 40 feet wide perpendicular to the center line of the breakwater. It was secured by four anchors, one at each corner. A range or marker was placed on the deck of the car float as a guide for the captain of the tug in positioning the dump scow. The scow was then brought into the car float with the bow end of the scow against the side of the car float at the point of range. A line was then put out from the scow to the car float to hold the scow in position during the dumping operation. When the scow was properly positioned for unloading, its captain would dump the rocks from the hoppers by means of a

hydraulic mechanism in the cabin of the scow. The evidence establishes that on occasions the tug approached said car float at an excessive speed or that there was a failure by its captain to reverse its engines with the result that the scows struck the car float and drove it back from its anchored position distances varying from 25 to 100 feet.

Each scow made approximately 250 round trips from the loading berth to the breakwater site and together transported 824,244.3 net tons of quarry run granite rocks, much of which was rough, jagged and pointed. For the services of said scows and tug, Gammino paid Moran the sum of $483,893.19.

Moran completed its work under said contract on December 3, 1960. The scows were used thereafter for a brief period to transport gravel for Gammino under another contract and were then towed to New York and placed in drydock for inspection and repairs.

Early in the spring of 1961, the following work was done on each of the scows at the direction of Moran, viz: all hopper doors on each of the scows were removed and replaced with steel doors; all hopper cables were removed and replaced with new cables, including all hardware and the complete replacement of hopper door chains; 27 of 28 slope plates were renewed in whole or in part; all pipe guards over the intermediate or transverse bulkheads were removed and replaced with new pipe guards as were all cable guards; substantially all of the forward bulkhead of the No. 1 hopper and the after bulkhead of the No. 7 hopper was removed and replaced with new steel plates; 13 slope angles on the Moran 104 and 26 slope angles on the Moran 106 were removed and replaced with new slope angles. In addition, portions of the coaming and hydraulic piping on each of the scows were removed and renewed, as were some of the bottom plates on each of the scows. The total charge of Bethlehem Steel Company for this work was $325,446, with the result that the scows were restored to their original condition at the time of their launching in 1955.

As a consequence of a grounding of the tug, Julia C. Moran, at the breakwater site, her propeller was damaged. Immediately thereafter she was returned to New York for repairs. Moran seeks the sum of $5,127.08 for repairs to said propeller, the cost of a replacement propeller and the expense of a substitute tug to continue the performance of its contract.

As hereinbefore recited, this was a protracted trial. It would unduly extend this opinion to undertake to summarize the testimony of the many witnesses who testified concerning the manner in which the scows were loaded, the weights of the rocks loaded, etc., and the cause or causes of the physical condition of the scows upon completion of the contract.

After a careful consideration of all of the testimony of these witnesses, I am convinced that Gammino frequently loaded rocks weighing in excess of 1,000 pounds on each of said scows. Although, in answers to interrogatories it denied ever loading rocks weighing in excess of 1500 pounds and estimated on information and belief that it loaded approximately 60 stones each day on each scow that weighed between 1000 and 1500 pounds, I am also convinced that on occasions it loaded rocks weighing in excess of 1500 pounds. Similarly, I am convinced that on occasions Moran's representatives directed that rocks weighing more than 1500 pounds, be removed from the conveyor and that they be loaded by the skip box. However, there was no satisfactory or clear evidence as to how frequently this occurred and no evidence whatever that any specific rock or rocks weighing more than 1000 pounds caused any particular damage to either of said scows.

There is an irreconcilable conflict in the testimony as to the cause of the physical condition of said scows upon the completion of said contract in December, 1960. Moran by its witnesses sought to establish that none of said

condition was attributable to ordinary wear and tear due to the loading and dumping of rocks weighing 1000 pounds or less. Testimony presented by Gammino was to the effect that rocks weighing 1000 pounds, and substantially less, dropped from said conveyor a distance of 25 to 30 feet on a preload of 20 to 30 tons in said hoppers would cause said physical condition. The testimony establishes beyond doubt that in the ordinary loading process rocks fell from the conveyor a distance of 25 to 30 feet onto the preload and built up in the shape of a cone, and that succeeding rocks falling from the conveyor struck said cone, bounced off and then struck against the slope plates, pipe guards, bulkhead plates and coamings. Moran's contention that no part of said physical condition of said scows was due to the proper loading of rocks weighing 1000 pounds or less is clearly contrary to the credible evidence in this case. After considering all of the evidence on this issue and the reasonable inferences to be drawn from it, I am convinced that the physical condition of each of said scows in December, 1960 was caused in large part, if not entirely, by the normal loading and dumping of rocks weighing 1000 pounds or less and constituted "ordinary wear and tear—due to the nature of the material transported" for which Moran, not Gammino, assumed responsibility in said contract, it having included in the rate per ton, charged to Gammino, the cost of repairing such wear and tear and a charge for estimated depreciation in the value of its scows from such use.

Although I am convinced that Gammino did frequently load rocks weighing in excess of 1000 pounds, Moran has completely failed to prove what portion of said physical condition was caused by the loading and dumping of such rocks. Similarly, it has failed to prove what portion of such condition was caused by any negligent operation of said skip box as distinguished from such ordinary wear and tear, as would realistically be expected to result from the use to which it was put with Moran's approval, having in mind its size and load and the area in which it was used.

It is well settled that if property is damaged by different causes from each of which there is more or less damage to the property, if a portion of the damage is from a cause for which the defendant is not liable, the burden of proof is on the plaintiff to establish with reasonable certainty the damages from the cause for which the defendant is liable. Damages based upon conjecture or speculation are not recoverable. Facts must be established which afford a reasonable basis of computation of the damages for which Gammino is liable under the provisions of said contract. Niagara Fire Ins. Co. v. Muhle, 1953, 8 Cir., 208 F.2d 191; United States v. Huff, 1949, 5 Cir., 175 F.2d 678; Chicago B. & Q. R. Co. v. Gelvin, 1917, 8 Cir., 238 F. 14; Avrutick v. United States, 1958, D.C.D.C., 164 F.Supp. 585; C. G. Post, 1945, D.C.N.Y., 64 F.Supp. 191; 15 Am. Jur. Sec. 20, p. 410; 25 C.J.S. Damages § 26 b, p. 491.

As hereinbefore recited, Moran presented no evidence to establish what portion of said physical condition of its scows, in December, 1960, was due to a cause or causes for which Gammino is liable, as distinguished from that portion which was the result of ordinary wear and tear. Under the circumstances, it is impossible for me to determine what portion of the total cost of the repairing and restoring of said scows to their condition when they were launched in 1955 is attributable to a cause or causes for which Gammino is responsible. For me to undertake to do so would be to indulge in conjecture and speculation. Since Moran has failed to establish a reasonable basis of computation of any damages against Gammino, it is not entitled to recover any part of the cost of repairing and restoring its scows.

The evidence established that on July 1, 1960, the tug, Julia C. Moran, backed into a shoal area at the breakwater site where there was only 10 feet

of water and sustained damage to her propeller. Here, too, the testimony is conflicting as to the circumstances under which this incident occurred. The credible evidence convinces me that said area was properly marked indicating the existence of shallow water and that the captain of said tug had been warned to keep said tug at least 100 feet away from that area. Apparently, through inattention or an error in judgment, he failed to do so. I find that the libellant has failed to establish by a fair preponderance of the evidence that the damage to the propeller of said tug, Julia C. Moran, was caused by any negligence or breach of contract by Gammino.

Accordingly, a decree will be entered in Admiralty No. 1824 dismissing said libel with costs to the respondent.

In Civil Action No. 2868, in view of my findings and conclusions in Admiralty No. 1824, there is no occasion for me to discuss herein the various defences asserted by Hartford to the claims asserted against it by Moran. Since Moran has failed to establish any claim against Gammino for which Hartford as surety might be liable, judgment will be entered in Civil Action No. 2868 in favor of the defendant, Hartford Accident & Indemnity Company.