**MORAN TOWING CORPORATION**
et al., Appellants,

v.

**M. A. GAMMINO CONSTRUCTION CO.**
et al., Appellees.

No. 6630.

United States Court of Appeals
First Circuit.

Heard March 7, 1966.

Decided June 27, 1966.

Eugene Underwood, New York City, with whom Robert W. Meserve, Boston, Mass., Robert B. Pohl, New York City, Nutter, McClennen & Fish, Boston, Mass., and Burlingham, Underwood, Barron, Wright & White, New York City, were on brief, for appellants.

Donald M. Waesche, Jr., New York City, with whom Claude R. Branch, Providence, R. I., Louis P. Sheinbaum and Bigham, Englar, Jones & Houston, New York City, were on brief, for M. A. Gammino Const. Co., appellee.

Edward F. Hindle, Providence, R. I., with whom Ronald R. Lagueux, Richard M. Borod and Edwards & Angell, Providence, R. I., were on brief, for Hartford Accident & Indemnity Co., appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

ALDRICH, Chief Judge.

This is an action for damages suffered by appellant Moran Towing Corporation's two dump scows while carrying breakwater stone pursuant to a contract with appellee M. A. Gammino Construction Company. Gammino loaded the scows, but Moran supplied the dumper captains, and a tug and crew for operating the equipment. The scows required extensive repair at the end of the service. The case was tried to the court, and resulted in a determination of no liability. While underlying questions of law are involved, the appeal raises principally the adequacy of the evidence and the correctness of the court's findings.

We observe at the outset that our task has been unduly complicated by the manner in which the testimony has been presented. Moran's record appendix contains some 500 printed pages of testimony; Gammino's, some 400. In most instances the same witnesses are involved, each party, the appellant initially, picking and choosing the fragmented portions of their testimony it would like us to see. An appellant is charged with presenting "such * * * parts of the [testimony] * * * as [it] * * * deems it essential for the judges of the court to read in order to decide" the question presented. 1st Cir.Rule 23. This means the relevant testimony, not simply the testimony favorable to the appellant. Chernack v. Radlo, 1 Cir., 1964, 331 F.2d 170. A similar provision applies to the appellee with respect to matters not printed by appellant. It is difficult to conceive that there could fairly be such a wide diversion between the parties with respect to what testimony was relevant. Either Moran printed far too little, or Gammino far too much. The result has been that to read the testimony presented of many of the witnesses requires constant cross reference. A little of this activity may be expected if counsel cannot agree on a joint record appendix, but the extremes reached in the present case should not occur.

The claimed repaid bill was $325,446.[1] The question was whether, and to what extent, the repair was for Gammino's account. The difficulties arose principally from a provision of the contract, which, at least in retrospect, seems peculiarly perverse. A more complete extract of the parties' agreement appears in the opinion of the district court, D.R.I., 1965, 244 F.Supp. 729, and may be referred to there, but the principally significant portion is paragraph 9.

---

1. Moran also claims $25,892.81 for loss of use of the scows while laid up for repairs, and $900 for surveyors' fees and the hire of tugs. The aggregate is, accordingly, $352,238.81. Moran furnished a full breakdown of individual items, so that no difficulty of computation arises once the court has resolved the problems of allocation.

"We [Moran] shall be responsible for all ordinary wear and tear to our vessel equipment due to the nature of the material to be transported, but you [Gammino] shall be responsible for any damage to our vessel equipment due to your negligence, or for any damage to our vessel equipment whether or not due to your negligence that may be occasioned by loading or unloading of pieces weighing in excess of 1000 lbs. per piece."

Since the "material to be transported" was sharp pieces of "quarry run" granite, loaded by dropping from a considerable height, the question of what was ordinary wear and tear due to the nature of the material was not an easy one. Admittedly, some rocks over 1,000 pounds were loaded. How many, was a difficult question. Having in mind that the overall volume carried during a 23-week period exceeded 800,000 tons, it was even more difficult to tell what portion of the repairs were necessitated by rocks that weighed under 1,000 pounds, and by those that weighed over 1,000 pounds, as to which even ordinary wear and tear was Gammino's responsibility.

With one or two relatively minor exceptions, no witness was able to testify that he had observed a complete chain of events resulting in any particular, identified alteration in the condition of the scows. In broad outline, Moran met this problem by offering proof of the condition of the scows before and after the service, proof of various events during the service the risk of which Gammino had assumed, and expert testimony that only those events which were Gammino's responsibility had sufficient damage potential to account for the change in the condition of the scows.[2] Gammino countered by offering proof that few, if any, events took place that were within its own responsibility, and expert testimony that, in any case, activity for which Moran had assumed responsibility had sufficient damage potential to

explain the change in the condition of the scows.

Moran placed particular weight on the testimony and reports of two surveyors in the employ of the United States Salvage Association, an association of marine experts organized by marine underwriters. These surveyors, originally requested by underwriters for either party, inspected the scows after the service and recommended the repairs that are now the subject of suit. It is clear that in preparing their report the surveyors were obliged by the rules of the Association to reach a judgment as to responsibility for, and cause of, as well as need for repair of, various aspects of the condition of the scows. Moran argued that the agreement reached by the surveyors was a binding admission by Gammino, and sought to support its reasoning with the rules of the Association and provisions in the indenture between Gammino and its underwriter.

It would perhaps have been the better practice to admit these documents into evidence for whatever they might have shown, but they were marked for identification and we have reviewed them. We find that the error, if any, was not prejudicial. Whatever the survey practice among underwriters, nothing in the record, or offered for the record, would warrant the conclusion that the parties agreed to be bound by the opinion of the surveyors insofar as this rather particular contract is concerned. The contract allocated responsibility on the basis of what turned out to be overly nice discriminations among causes. On this question, the surveyors stood on no ground necessarily more secure than that upon which stood various others of the experts produced at trial who sought to reason back from the final condition of the scows in order to sort out the causes of aspects of that condition.

The court found, "Gammino frequently loaded rocks weighing in excess of 1,000 pounds on each of said scows * * *

---

2. Contrary to an intimation in the court's opinion, Moran made some repair, although not a large amount, for which it made no claim.

[and] on occasions it loaded rocks weighing in excess of 1500 pounds. * * * However, there was no satisfactory or clear evidence as to how frequently this occurred and no evidence whatever that any specific rock or rocks weighing more than 1000 pounds caused any particular damage to either of said scows." 244 F.Supp. at 734. It went on to point out that Moran's witnesses had sought to persuade it that no part of the repair was necessitated by ordinary wear and tear from rocks under 1,000 pounds, while Gammino's witnesses had sought to show that wear and tear by careful loading of rocks under 1,000 pounds could, of itself, have required all the repair. This was, as we have suggested, a substantially fair observation. We have rarely seen testimony more diverse.

The court resolved this difficulty by holding that the burden of proof was on Moran, as plaintiff, and that this included separating "with reasonable certainty" the part of the loss that was Gammino's responsibility from that which was not. It concluded that Moran had "completely failed" to meet this burden, and that it was "impossible" for the court "to determine what portion of the total cost * * * is attributable to a cause or causes for which Gammino is responsible." Id. at 735.

To this Moran makes a number of responses.[3] Factually, it seeks to argue that some of the court's findings are inconsistent. There is one sentence in the opinion perhaps not happily expressed, but, as Moran eventually concedes, the most this amounts to is an implication that the court "was almost persuaded" that no part of the condition of the scows was due to stone of the forbidden size. With respect to this, a full review of the record satisfies us that the court was warranted in concluding that although some damage was undoubtedly caused by oversize rocks, substantially as much rock damage would have resulted had no pieces over 1,000 pounds been loaded.

■ Under these circumstances Moran's legal position cannot be maintained. This can best be illustrated by considering some of its cases. Moran contends that where it is not possible to separate the injury caused by a wrongdoer from other injury not occasioned by him, the wrongdoer must be the one to bear the consequences. Assuming the propriety of such a principle in some situations, this is not one. In the first place, this is not a tort case. Under the contract Gammino had a right to injure the scows to the extent that injury was to be expected as a result of "wear and tear * * * due to the nature of the material." To say it was a wrongdoer is too simple a solution. Rather, it was a wrongdoer only to the extent that it injured the scows beyond the extent of its granted permission. On this basis, even if we could assume some burden on Gammino, Gammino has essentially satisfied it by the court's finding that the rock damage did not substantially exceed ordinary wear and tear from rocks of 1,000 pounds and under.

Even if we consider Moran's cases, all of which sound in negligence, to be fully applicable, they do not compel a finding in its favor. In Nassau Sand & Gravel Co. v. Red Star Towing & Transportation Co., 2 Cir., 1932, 62 F.2d 356, respondent berthed libellant's barge in an unsafe place, where she grounded. Apparently, before she could be repaired, she grounded again, this time due to libellant's fault. The district court, 52 F.2d 704, found that the first grounding had been the one to break the keel. In affirming, the court of appeals held that where injury had been clearly proved, the burden was on the respondent to show the extent that any loss resulted from the second occasion. The Mason, 2 Cir., 1918, 249 F. 718, is to the same effect.

These are cases where a defendant whose fault clearly brought about an

---

3. We deal in this footnote, only, with Moran's novel claim that Gammino is conclusively bound by an answer it gave to an interrogatory. This confuses interrogatories with demands for admission of facts. An answer to an interrogatory is no more "formal" than any other evidence.

injury-producing event sought to cast upon the plaintiff a burden of disassociating some other possible harm caused by the libellant. They differ from the question we are now considering in that the courts there made findings of significant injury for which the defendants were responsible. The burden which may arise after that differs from the burden of showing damage in the first place.

A case where the defendant caused all of the harm is Jenkins v. Pennsylvania R. R. Co., 1902, 67 N.J.L. 331, 51 A. 704, 57 L.R.A. 309. This was an action for smoke damage occasioned by defendant's locomotives. It was conceded that the defendant would not be responsible for loss occasioned by the normal amount of smoke, but plaintiff proved that the boilers were improperly fired, causing excessive smoke. The trial judge charged the jury that the plaintiff had failed to produce evidence upon which the consequences of the two types of smoke could be distinguished. The Court of Errors and Appeals, in reversing, said at p. 336, 51 A. at p. 706, "[I]t being found that a substantial part of the loss was occasioned by his [sic] tortious act * * *. To say that the plaintiff must be denied a substantial recovery because of the impossibility of distinguishing between the consequences that were lawfully originated and those that were unlawfully imposed upon him * * * is to require the injured party to bear the entire burden of loss."

We may observe, with respect to *Jenkins,* that it was particularly appropriate to place a burden on the defendant because, not only had it caused all the injury, but it was relying solely upon an ob-

ligation imposed by law upon the plaintiff to tolerate the consequences of "necessary" smoke. In such circumstances it seems reasonable that any difficulty in drawing the line should be defendant's. But, in any event, the plaintiff there had successfully established that some substantial harm, over and above permissible smoke damage, had occurred.

The case on which Moran principally relies is Navigazione Libera T.S.A. v. Newtown Creek Towing Co., 2 Cir., 1938, 98 F.2d 694. In that case libellant's propeller was broken by a collision due to the negligence of claimant's tug. No question presently relevant arose with respect to the repair of the propeller, but claimant resisted the cost of drydocking on the ground that there was an independent reason why the vessel would have had to be drydocked in any event. Claimant's legal position was not sustained. We have some question whether, in this respect, the case was rightly decided.[4] But even if it was, this was a case where some physical effects of the defendant's improper action were clearly proven, and only the allocation of joint, or overhead, expenses was at issue. Rather than demonstrating error in the district court's refusal to place a burden upon the defendant, it contains the important factor which the court here found to be missing in plaintiff's proof. It is true that in *Navigazione* the court expressed apprehension lest through "casuistries" the claimant should "escape through the meshes of a logical net," 98 F.2d at 697. This, however, voices a fear that does not arise until the party is inside the net.

4. We observe a certain inconsistency in the opinion itself. It happened that libellant's vessel had a spare propeller on board. This circumstance saved a considerable period of detention, which would have otherwise been required at the claimant's expense. Libellant sought to include in its damages essentially what such detention would have occasioned, apparently on the basis that the claimant should not have the advantage of this windfall. The court rejected what it regarded as an "amazing claim." With this we agree.

There was no reason for libellant to be compensated for a loss which might have been, but which was not in fact, suffered. But, correspondingly, it seems arguable that a tortfeasor has not caused a boat to be drydocked when, because of a prior defect, it already required drydocking. If there was a burden of segregating losses, claimant satisfied it to the extent that it proved that no additional expense was imposed by its conduct. The court's contrary decision would seem to confer a windfall on the vessel.

The principle enunciated by Moran's cases is not apposite until, at the least, it has sustained the burden of showing illicit damages to the scows. This must mean damage of some consequence. Even if the court's finding may suggest some minimal additional damage beyond expected wear and tear as a result of oversize rocks, a minimal amount of damage is not enough to place upon Gammino a burden of segregation. To hold otherwise would, in our opinion, be an unreasonable imposition, and an unreasonable interpretation of the contractual permission.

This does not, however, dispose of the case. There was considerable damage to the scows which we think Moran proved was caused in all probability by the loading equipment. This raises a different question. Most of the stone was dropped some 20–25 feet from a conveyor belt. The parties foresaw that jagged rocks, even of the agreed weight, could not be dropped into an empty scow without seriously damaging the hoppers. Accordingly, the contract provided that Gammino should "properly load" each scow. The parties agree that proper loading required that the "well" of each hopper, or "pocket," be "preloaded" with a layer of stone to serve as a cushion and distribute the impact of the stone that would be dropped thereafter. This preload was introduced into each pocket by lowering it in a truck body, or skip box, suspended from a "stiff-leg" crane, and spilling it out close to the dumper doors at the bottom of the pocket well.[5] The skip box was relatively large for the size of the pocket. It weighed, loaded, about thirteen tons, and light, three tons, and had sharp protruding reinforcement irons. When being lowered or raised it tended to swing, and to recoil when it was unloaded. In order to keep the box out of contact with the scow there was a tag line or guide rope. Nevertheless, the court found that "on occasions," and the testimony would warrant frequent occasions, the skip box struck "various parts of the scow, including the slope plates, pipe guards, chain guards, coamings and bulkheads." Id. 244 F.Supp. at 733. We believe, too, that Gammino's own evidence reveals that with sufficient care this could have been avoided.[6]

Nor can Moran be charged with failure to identify at least some of the damage attributable to these contacts. For example, certain guards were bent, not down, but up. It would be speculation of the highest order to assume that rocks had bounced up and done this damage when the obvious answer was a rising skip box. Almost equally obvious was substantial damage to the coaming. We note, without limiting ourselves, other damage, such as to the well plates, that it would have been considerably more reasonable to conclude came from the skip box than from falling stone.[7] The court made no reference to these separate items of damage, but disposed of this aspect of the case in one sentence:

"[Moran] has failed to prove what portion of such condition was caused by any negligent operation of said skip box as distinguished from such ordinary wear and tear, as would realistically be expected to result from the use to which it was put with Moran's

---

5. The crane was not ready when the scows were first put into service. For a time preloading was accomplished with a clamshell bucket. Later Moran agreed that a preload of small stones and "fines" could be loaded directly off the conveyor belt. The skip box procedure was introduced in the latter part of July.

6. Alfano, Gammino's project manager on this job, and a principal defense witness, testified that "occasional[ly]" he observed the skip box strike the scows. When Moran's lawyer suggested that this was to be expected, Alfano protested, "No, it wasn't unavoidable." Gammino's witnesses were at great pains to explain the efficacy of the tag line. Throughout the proceedings Gammino contended not that damage by the skip box could not be prevented, but that it was prevented.

7. Alternatively, this damage came from conveyor-dropped rocks after the well had been insufficiently or improperly preloaded; again, Gammino's responsibility.

approval, having in mind its size and load and the area in which it was used." Id. at 735.

■ The fact that Moran knew that Gammino was using a skip box does not mean that it waived the provisions of the contract. In deed, what was "realistic" was that Gammino could be as negligent as it pleased, so long as ultimately it paid for the consequences.[8] Any suggestion implicit in the court's statement that whatever Moran may have seen and did not complain about was not chargeable to Gammino was erroneous. Gammino was not so easily discharged of its duty of due care.

■ The court's conclusion involved a more substantial error, a misconception of what was meant by wear and tear. Wear and tear means normal depreciation. Green v. Kelley, 1845, 20 N.J.L. 544. No doubt what is "normal" must be responsive to practices in the service for which the vessel is intended. New York, N. H. & H. R. Co. v. Delaware, L. & W. R. Co., 2 Cir., 1928, 23 F.2d 487; The G. G. Post, W.D.N.Y., 1945, 64 F.Supp. 191. In this case, the contract expressly tied wear and tear in with "the nature of the material to be transported." It did not, however, tie it in with contacts by the skip box, even if, in one sense, rough handling might have been anticipated,

unless by the nature of things such contacts were unavoidable. The effects of negligence are not wear and tear, and they do not become wear and tear merely because they may be anticipated.' Gorman Leonard Coal Co. v. Peninsular State S.S. Corp., 1 Cir., 1933, 66 F.2d 83; The G. G. Post, supra.

■ If this case is viewed in perspective, Moran not only supplied the scows from June to December, but furnished a tug and crew. It received a gross payment from Gammino of $483,893. It paid out $181,500 to charter the tug, and $24,440 to bare boat charter the scows. If $325,446 was expected wear and tear "for which Moran, not Gammino, assumed responsibility * * *, it having included in the rate per ton * * * the cost of repairing such wear and tear and a charge for estimated depreciation," 244 F.Supp. at 735, Moran estimated its profits on the contract at a minus $47,-500. Even this loss does not include substantial additional labor, overhead, etc. This seems to us anything but "realistic."[9] It may be that Moran underestimated the damage that would be occasioned by proper-sized rock, or it may be simply that it failed to satisfy the court as to the damage attributable only to the oversized pieces. As to the skip box, however, we hold that it made a suf-

8. This is by no means a farfetched position. Gammino had a $3,800,000 contract with the Navy which, among other provisions, specified the proportion of rock by weight to be used in various stages of the breakwater construction. The evidence shows that Gammino was under continual pressure from the Navy to meet these specifications, particularly by limiting the amount of small rock, fines and dirt. The skip box procedure obviated conveyor preloading, which had depended upon use of this small material. At the same time, if Moran complained about the skip box, or sought to withdraw its equipment, it might face a suit for breach of contract involving the same difficult proof which it has, in fact, encountered. Presented with an analogous dilemma, the Navy made the same choice. The chief Navy inspector testified that he was of the opinion that Gammino never provided the proper mix

of stone. He explained that as a practical matter he was powerless to prevent it. Had he taken extreme measures while the work was in progress, the loss attendant upon such an interruption in the work would have been prohibitive. Moran could well think that the only reasonable course was to make the best of the situation, leaving adjustments until after the work had been done.

9. These figures subsume that the scows were in good condition at the commencement of the contract. The court made no finding on this. Moran introduced considerable testimony to this effect, both through its own witnesses and through some of Gammino's. Gammino did not counter this evidence in any substantial way. The picture is still impressive, however, even if it be assumed that the scows' condition was not perfect at the commencement of the work.

ficient showing. Only by a misconception of what was wear and tear could the court have concluded that Moran had failed to establish some measure of damage chargeable to Gammino on this aspect of the case. Indeed, to the extent that the court, on further hearing, has difficulty in this regard, the first three of Moran's cases cited supra in this instance seem properly apposite.[10] See, also, Bigelow v. RKO Radio Pictures, Inc., 1946, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652.

A perhaps more difficult question arises with respect to damage done to the bow plates through groundings of the scows. The burden was on Gammino to sound and not order the scows brought into insufficient water. Gammino failed, however, resulting in groundings on several occasions. On the other hand, at least one grounding was Moran's fault. We will not comment in any detail, but we do suggest that, consonant with the principles announced in this opinion, and in view of the predominant number of groundings for which Gammino was responsible, the evidence would seem to justify at the least, some measure of liability on Gammino.

So far we have not mentioned Moran's claim against another defendant appellee, Hartford Accident & Indemnity Company. Hartford is sued as the surety on Gammino's Miller Act bond. Its position is that the type of liability Moran asserts against Gammino is not within the bond. Because the district court dismissed against Gammino, it dismissed against Hartford without reaching this question. In view of our reversal, however, we must consider it.

The language of the Miller Act is rather strict.[11] Nevertheless, it has long been liberally construed. Specifically, in the case of rented equipment, not only does the surety's obligation include the rental, but if the principal has undertaken to repair, or to assume the expense of ordinary wear and tear, its failure to perform in this respect may be a matter covered by the bond. Continental Casualty Co. v. Clarence L. Boyd Co., 10 Cir., 1944, 140 F.2d 115; United States for Use and Benefit of Wyatt & Kipper Engineers, Inc. v. Ramstad Constr. Co., D. Alaska, 1961, 194 F.Supp. 379. The approach appears to be that normal consumption of the equipment is something which "goes into" the project. Cf. Massachusetts Bonding & Ins. Co. v. United States for Use of Clarksdale Machinery Co., 5 Cir., 1937, 88 F.2d 388.

The principle has been carried to the point of imposing liability on the surety when the principal undertook to assume responsibility for loss of the equipment, and the equipment was lost because of a casualty for which the principal was in no way to blame. United States for use of Llewellyn Mach. Corp. v. National Surety Corp., 5 Cir., 1959, 268 F.2d 610 (2–1). The court reasoned that had the principal not made this undertaking the rental would have been higher. We are not in accord with this reasoning. The fact that the principal might have been required to include in its rental payments a sum sufficient to pay premiums to insure the equipment against casualty losses should not mean that it can cast upon the Miller Act surety responsibility not for a normal premium, but an entirely new type of insurance coverage. It must be remembered that, at least to some extent, the act was intended as a substitute for liens which might otherwise have been claimed against government con-

---

10. Nor do we think that Moran should be placed in the dilemma of having asserted against it certain testimony indicating the extent that damage was caused by oversize rocks. This dilemma is Gammino's. If Moran's testimony in regard to the rocks is thought to be convincing for this purpose, the court should not have found as it did with respect to the rock damage.

11. "Every person who has furnished labor or material in the prosecution of the work provided for in such contract, in respect of which a payment bond is furnished * * * shall have the right to sue on such payment bond * * *." 40 U.S.C. § 270b.

struction. Cf. Arthur N. Olive Co., Inc. v. United States for Use and Benefit of Marino, 1 Cir., 1961, 297 F.2d 70, 72. The mere failure of the contractor to perform all the undertakings of his contract has consistently been held not to be a sufficient basis for imposing liability. E. g., United States for Use of Edward E. Morgan Co. v. Maryland Casualty Co., 5 Cir., 1945, 147 F.2d 423; L. P. Friestedt Co. v. United States Fireproofing Co., 10 Cir., 1942, 125 F.2d 1010.

However, the case at bar fits somewhere between these two situations. Unlike the *National Surety* case, damage to the Moran scows was not an unanticipated casualty. Rather, it was a definite possibility specifically dealt with by the parties in their agreement. The fact that such damage was due in significant part to Gammino's negligence does not solve the problem. In Massachusetts Bonding & Ins. Co. v. United States for Use of Clarksdale Machinery Co., supra, the court held that the Miller Act surety was liable for the cost of virtually complete overhauling of a number of trucks used by the contractor on a levee construction project. To the objection that such repairs amounted to replacement of the capital equipment of the contractor, the court pointed out that the nature of the work was such that considerable damage to the machinery was to be expected as a normal incident of the project. It considered the trucks, therefore, to be "consumable material."[12]

The present case stands in much the same posture. It is perhaps not an undue exaggeration to describe the Moran scows as having been "consumed" in the course of Gammino's use of them. Moreover, Gammino's acceptance of the obligation to pay for any excess wear and tear regardless of fault can properly be seen more as a form of compensation for their use than as a kind of insurance coverage.

■ While the distinction between this case and *National Surety* may be a fine one, we feel that the line drawn is an effective way of carrying out the Congressional intent to protect those persons who furnish the means for the improvement of United States property and at the same time prevent the Miller Act from being turned into a federally required insurance program for government contractors. Accordingly, we reject Hartford's claim that its bond does not cover the liability asserted in this case.

Judgment will be entered vacating the final decree and judgment of the District Court and remanding the actions for further proceedings not inconsistent herewith. No costs on appeal.

---

12. We are, of course assuming that the consumption, if it be such, was something that had to be paid for by the contractor.