**MORAN TOWING CORPORATION,**
Libellant,

v.

**M. A. GAMMINO CONSTRUCTION COMPANY, Respondent.**

**UNITED STATES of America for the Use and Benefit of MORAN TOWING CORPORATION, Plaintiff,**

v.

**HARTFORD ACCIDENT & INDEMNITY COMPANY, Defendant.**

Admiralty No. 1824; Civ A. No. 2868.

United States District Court
D. Rhode Island.
Oct. 2, 1968.

Benjamin A. Smith of Tillinghast, Collins & Tanner, Providence, R. I., Eugene Underwood, Robert B. Pohl, of Burlingham, Underwood, Barron, Wright & White, New York City, for libellant and plaintiff.

Claude R. Branch, Providence, R. I., John L. Quinlan, John G. deRoos, Donald M. Waesche, Jr., of Bigham, Englar, Jones & Houston, New York City, for respondent.

Edward F. Hindle, Ronald R. Lagueux, of Edwards & Angell, Providence, R. I., for defendant.

## OPINION

DAY, Chief Judge.

In these cases which had been consolidated for trial this Court, following a lengthy trial, found that there was no liability on the part of the respondent, M. A. Gammino Construction Company, or the defendant, Hartford Accident &

Indemnity Company, 244 F.Supp. 729 (D.C.R.I.1965). They are again before me following the entry of a judgment by the Court of Appeals for the First Circuit vacating the final decree and judgment entered in said cases by this Court and remanding said cases to this Court for further proceedings not inconsistent with its opinion. 363 F.2d 108 (1 Cir. 1966).

In said opinion, 363 F.2d at page 113, the Court of Appeals said:

"There was considerable damage to the scows which we think Moran proved was caused in all probability by the loading equipment * * * Nor can Moran be charged with failure to identify at least some of the damage attributable to these contacts. For example, certain guards were bent, not down, but up. It would be speculation of the highest order to assume that rocks had bounced up and done this damage when the obvious answer was a rising skip box. Almost equally obvious was substantial damage to the coaming. We note, without limiting ourselves, other damage, such as to the well plates, that it would have been considerably more reasonable to conclude came from the skip box than from falling stone."

And at page 115 of said opinion the Court of Appeals held:

"A perhaps more difficult question arises with respect to damage done to the bow plates through groundings of the scows. The burden was on Gammino to sound and not order the scows brought into insufficient water. Gammino failed, however, resulting in groundings on several occasions. On the other hand, at least one grounding was Moran's fault. We will not comment in any detail, but we do suggest that, consonant with the principles announced in this opinion, and in view of the predominant number of groundings for which Gammino was responsible, the evidence would seem to justify at least some measure of liability on Gammino."

Following said remand, protracted oral arguments were made by counsel for the parties and voluminous briefs filed by them on the issue of what damages to said scows were caused by the negligent operation of said skip box. In oral argument and in his original brief counsel for Moran contended that the negligent operation of said skip box was the cause of all the damages to said scows (except bottom damage), and that Moran was entitled to an award in its favor in the amount of $339,136, plus interest from May 17, 1961, on the amount expended by it for repairs and interest on the amount expended for the hire of two scows, since March 15, 1961, the date of the payment thereof. However, in rebuttal following arguments by counsel for the other parties in these cases, he suggested that in accordance with the rule of divided damages which is applied in admiralty cases in appropriate situations an award of fifty per cent of the total of said costs of repairs and other expenses to Moran would be an appropriate disposition of the claims involved in these cases.

While this suggestion would afford a simple solution to the complex problem now confronting me, I am convinced that the credible evidence presented during the trial of these cases and the reasonable inferences to be drawn from it do not warrant the entry of a finding in any such amount against Gammino.

In conformity with the opinion of the Court of Appeals, it is my duty to determine—

1. What part of the damaged condition of said Moran dump scows, the "104" and the "106", in December 1960 was caused by the negligent operation of said skip box by Gammino.

2. What portion of the damaged condition of said scows in December 1960 was due to groundings caused by Gammino's failure to provide a sufficient depth of water at the loading berth and at the breakwater site.

In determining the cost of repairs for the damage, if any, to said scows occasioned by the negligence or breach of contract by Gammino, I shall use the repair cost amounts as shown in plaintiff's Exhibit 93.

## The Coaming

The coaming is a fence-like structure located on the deck of the scows and extending around the hoppers thereof. According to said Exhibit 93, the cost of repairing the coaming on the "104" was $3,417, and on the "106" was $6,307, for a total of $9,724.

While there was ample evidence that during the loading of said scows, stones dropping from the conveyor into the hoppers would and did strike said coaming, there was also credible testimony that said skip box frequently struck said coaming. In my opinion Gammino's contention that said skip box did not strike the port coaming is unsound. It is clear from the evidence that as said skip box was lowered it would on frequent occasions recoil and strike the port coaming. In my opinion Moran has established illicit damage of some consequence to said coaming, both starboard and port. Since Gammino has failed to segregate the amount of said damage, I find that Gammino is fairly chargeable with one-half of the cost of repairing said coaming, which amounts to $4,862.

## Pipe Guards and Cable Guards

The pipe guards on said scows were located on top of each of the intermediate bulkheads separating the hoppers and consisted of steel pipe with a thickness of one-half inch and an interior diameter of twelve inches. The cable guards (chain guards) were attached to the intermediate bulkheads and the fore and aft bulkheads, and with respect to the intermediate bulkheads, a portion of the cable guard intersected the pipe guard.

The survey reports indicate that all of the pipe guards on each of the scows were indented and the evidence established that all of them were removed and renewed. The survey reports contain no reference to damaged cable guards— there is just the recommendation that the cable guards be removed, replaced, refitted, and resecured. Exhibit 93 recites the cost of renewing the pipe guards was $10,512, for each of said scows, or $21,024.

While there was much credible testimony that in the normal loading of said scows rocks falling from the conveyor a distance of 20 to 25 feet would strike said pipe guards, there was also credible testimony that said skip box frequently struck the pipe guards while being lowered into said hoppers. Counsel for Gammino concedes that the skip box did strike the center of the pipe guards, but contends that it did not strike the portion of the pipe guards which abut the starboard and port coaming. In my opinion this contention is without merit. Having in mind the weight of said skip box when it was loaded, I am satisfied that Moran has established that the negligent operation of said skip box caused damage of some consequence to said pipe guards for the renewal of which it was necessary to remove and replace said cable guards. I also find that the cost of such removal and replacement was included in the cost of renewing said pipe guards as shown on said Exhibit 93. Since Gammino has failed to segregate the illicit damage caused to said pipe guards by said skip box, Moran is fairly entitled to recover from it fifty per cent of the cost of removing and renewing said pipe guards, to wit, the sum of $10,512.

## Hydraulic Piping

The hydraulic piping is located on the deck of each scow and runs alongside the coaming. The survey reports describe the hydraulic piping as being kinked and twisted. The surveyors recommended that it be removed and renewed with necessary fittings. Exhibit 93 shows a repair cost of $2,685, for the "104" and of $3,308, for the "106". Although stones falling from the conveyor did also strike the hydraulic piping, there was

credible evidence, as hereinbefore pointed out, that the skip box frequently struck said coamings and thereby caused damage to said hydraulic piping. In my opinion Moran has established that said skip box caused illicit damage of some consequence to said hydraulic piping. Since Gammino has failed to segregate said illicit damage, Moran is entitled to recover fifty per cent of the cost of repairing said damage, which amounts to $2,996.50.

### Well Plates and Well Brackets

The well plates are steel plates located in each of the hoppers of said scows which extend vertically from the bottom of the slope plates to the hopper doors. The survey reports indicate that in the "104" the port side well plates in hoppers numbered 2 and 4, and the starboard side well plates in hoppers numbered 3, 4, 5 and 7 were indented or buckled. In the "106" the port side well plates in hoppers numbered 3, 5 and 6 were indented or buckled.

The repair cost for the well plates, according to Exhibit 93, was $800 for the "104" and $700 for the "106".

The well brackets are internal structural members of the scows which reinforce the well plates. Said survey reports recite that in the "104" one starboard well bracket in hopper numbered 2 and one port side well bracket in hopper numbered 7 were damaged. In the "106", two starboard well brackets in hopper numbered 4 and one starboard well bracket in hopper numbered 7 were damaged. Undoubtedly the well plates were damaged by the normal dumping process of the hundreds of thousands of tons of rough, pointed quarry run rock which, when the hopper doors were opened, fell through said wells and struck said well plates. On the other hand, I am of the opinion that there was sufficient evidence to warrant a finding that illicit damage of some consequence was caused to them by conveyor dropped rocks after said wells had been insufficiently preloaded. Since adequate preloading was the responsibility of Gammino and it has failed to segregate the damage caused by its failure in this regard, the plaintiff is entitled to recover fifty per cent of the cost of repairs to said well plates, which amounts to $750.

Since an examination of the surveyed damage to said well plates and to the well brackets shows that in no instance was there corresponding damage to the well plate and bracket in any hopper, I conclude that either said well brackets were in a damaged condition prior to the Tiverton project or that they were damaged as a result of the wear and tear occasioned by the loading and dumping of more than 800,000 tons of said quarry run rock. I find no merit in Moran's contention that the skip box struck the well plates and thereby damaged said well brackets. Accordingly, Gammino is not liable for the cost of repairing said well brackets.

### Shell Plating and Frames

The survey reports indicate damage to the bow rake plates and frames. These plates are at the forward exterior of the scows, extending up from the bottom plating. According to said Exhibit 93, the cost of repairs thereto was $6,787. for the "104" and $6,413. for the "106", or a total of $13,200. The evidence discloses that on at least four occasions the "104" grounded at the loading berth owing to an insufficient depth of water. The "106" was never grounded at the loading berth. Both scows grounded at the dumping site on four occasions for the same reason.

The record further establishes that on at least nine occasions Moran's employees drove one or the other of said scows in such a manner that it struck the steel car float at the dumping site forcing it from its anchored position distances varying from 25 to 150 feet. On at least one of these occasions the "106" struck rock that had been dumped previously; on another, the "104" struck the car float with sufficient force to break its southwest cable.

In my opinion Moran has established that illicit damage of some

consequence to said shell plating and frames was caused by Gammino's failure to provide a sufficient depth of water for said scows. Since Gammino has failed to segregate this damage from that which was undoubtedly caused to said scows by the negligence of Moran's employees, it is fair and equitable that Gammino should pay fifty per cent of the cost of repairing the damage to said shell plating and frames, to wit, the sum of $6,600.

### Slope Plates and Slope Angles

There are two slope plates in each hopper, port and starboard, a total of 28 for the two scows. These plates are comprised of ¾ inch steel plating that extends downward from the bottom of the coaming to the top of the well plate.

Said survey reports of the condition of the "104" recite that all seven of the port side plates were deeply indented and were completely renewed. Six of the seven starboard plates were deeply indented and renewed. Apparently the starboard slope plate in hopper numbered 1 did not require any repair.

All seven of the port side slope plates in the "106" were deeply indented and completely renewed. Four of the starboard plates were completely renewed, and three were partially renewed. According to Exhibit 93, the cost of these repairs was $62,627. for the "104" and $61,382. for the "106", for a total cost of $124,009.

The slope angles are internal structural members which support said slope plates.

There are 16 slope angles in each of said hoppers, and of the 112 slope angles on the "104" 13 were surveyed for repairs, 7 on the port side and 6 on the starboard side. On the "106", 28 were surveyed for repairs, 18 on the port side and 10 on the starboard side.

According to Exhibit 93, the cost of the repairs for said slope angles on the "104" was $1,755. and $3,780. for the "106", for a total of $5,535.

The slope plates were subjected to constant pounding by thousands of tons of granite rock, much of which was rough, jagged and pointed, which fell a distance of 20 to 25 feet from the conveyor. According to the evidence, the rocks built up in a cone shape and rock thereafter dropped from said conveyor would bounce off the cone in all directions and strike against the slope plates, causing indentations therein. Such indentations in the slope plates began to appear shortly after July 4, 1960 whereas it is undisputed that the skip box was not put in operation until late in July, 1960. In my opinion the damage to said slope plates was caused by the loading of thousands of rocks weighing 1,000 pounds or less, and the bouncing of such rocks off the cone against said slope plates. Moran has failed to establish that any illicit damage of some consequence was caused to said slope plates by any negligent operation of said skip box. In the absence of such a showing, Moran is not entitled to recover any part of the cost of repairing said slope plates.

Similarly, I find that Moran has failed to prove that any negligent operation of the skip box or improper loading caused any illicit damage of some consequence to the slope angles. In my opinion any damage thereto was caused by the normal loading of rocks weighing 1,000 pounds or less. Moran is not entitled to recover any part of the cost of repairing said slope angles.

### Bulkhead Plating

### Bulkhead Stiffener

The bulkhead plates are located at the forward end of hopper numbered 1 and at the aft end of hopper numbered 7 of each of said scows. The survey reports state that the bulkhead plating on the forward bulkhead in hopper numbered 1 and the after bulkhead in hopper numbered 7 of each of said scows was indented and needed repair, and that the bulkhead stiffener (an internal structural support) behind the forward bulkhead in the "104" was buckled and required repairs.

According to Exhibit 93, the cost of said repairs to the bulkhead plating of the "104" was $5,346. and for the "106", $4,622. In addition the cost of the repair to said bulkhead stiffener was $91; the total cost of said repairs being $10,059 for both scows.

In my opinion the evidence clearly warrants the finding that the damage to said bulkhead plating and bulkhead stiffener was caused by rocks falling from said conveyor, bouncing off the cones after they were built up in the hoppers, and then striking the bulkheads. There was no satisfactory showing by Moran that illicit damage of some consequence was caused to said bulkhead plating and stiffener by any negligent operation of said skip box. Gammino is not liable for the costs of any repairs thereto.

### Hopper Doors

Each of the seven hoppers of each of said scows had a set of doors. At the time involved herein, these doors were constructed of wooden timbers bound together by steel straps. The doors were suspended on the outboard sides by hinges which were attached to said doors and to the slope plates. The doors were lowered to an open and raised to a closed position by chains and cables which were connected to a hydraulic system located on the deck of each scow.

After completion of the Tiverton project, all of the wooden doors of each scow were removed and replaced with new steel doors.

Mr. Eugene F. Moran, Jr., Vice-President of Moran, testified that said doors had been reversed in 1959, after being used for four years to minimize the abrasive effect of such use. At the conclusion of the Tiverton project in December, 1960, all of the doors were worn, abraded and split.

There was ample evidence to support the finding that the condition of said doors in December, 1960 was the carrying and dumping of more than 800,000 tons of rough, jagged, quarry run granite rocks since June 23, 1960. There has been no showing by Moran that illicit

damage of some consequence was caused to said doors by Gammino's alleged negligent operation of said skip box. In the absence of such showing, Moran is not entitled to recover any part of the cost of replacing said doors.

### Door Hinges and Headers

The door hinges and headers were not damaged but apparently were removed and replaced in order to permit the renewal of the slope plates. The cost of removing and replacing them according to Exhibit 93 was $8,375. for the "104" and $8,450. for the "106", a total of $16,825.

Finding as I do that Gammino is not liable for the cost of the renewal of the slope plates on said scows, Moran is not entitled to any award in its favor for the cost of removing and replacing said door hinges and headers.

### Miscellaneous Items
### Cross-Trees and Pipe Stanchions

Gammino concedes its liability for the cost of repairs to these items which amounts to $581.

### Staging, Testing, Cleaning
### Drydocking and Related Items

■ In order to effect the repairs to said scows which were recommended by the survey reports, it was necessary to drydock them for the time necessary to effect said repairs and to incur expenses for staging, testing, coating, removal and replacement of manhole covers, exhaust of oxygen, etc. According to Exhibit 93, these expenses amounted to $8,495. for each of said scows, or a total of $16,990. Under the terms of its agreement with Gammino, Moran was responsible for "all ordinary wear and tear due to the nature of material to be transported". It is obvious that rock damage which constituted ordinary wear and tear within the terms of said agreement required said drydocking with its incidental expenses. There has been no showing by Moran that any repairs occasioned by the negligence of Gammino extended the lay-up period required for the repairs which were the responsibili-

ty of Moran, or increased the amount of related expenses. Accordingly, Moran is not entitled to recover from Gammino any part of the cost of drydocking and its related expenses.

### Loss of Use of the Scows

The evidence established that Moran lost the use of the "104" and the "106" for approximately two and one-half months. As a result, Moran was obliged to hire two other dump scows during said period for each of which it paid a monthly hire of $5,000. This outlay amounted to $25,892.81.

As hereinbefore pointed out, it was necessary to drydock said scows to repair rock damage that constituted ordinary wear and tear within the terms of said agreement. There has been no showing by Moran that the lay-up period required to repair said scows was extended by reason of repairs required by skip box damage. In the absence of such proof, Moran is not entitled to recover for the loss of use of said scows or, as in the instant case, the rental of other scows to replace them during said lay-up period. The Pocahontas, 1940, 2 Cir., 109 F.2d 929; Clyde S.S. Co. v. City of New York, 1927, 2 Cir., 20 F.2d 381.

### Interest

It is well settled that in admiralty the award of interest is a matter within the discretion of the Court. However, this is a legal discretion and interest is to be awarded when damages lawfully due are withheld unless there exist exceptional circumstances which justify the refusal thereof. The Wright, 1940, 2 Cir., 109 F.2d 699; San Juan Trading Co., Inc. v. The Marmex, 1952, D.C.P.R., 107 F.Supp. 253, aff'd 1953, 1 Cir., 212 F.2d 206. I find no exceptional circumstances in these cases which would justify the refusal of interest on the amount that Moran is entitled to recover.

In summary, in Admiralty No. 1824, I find that the libellant, Moran Towing Corporation, is entitled to recover from the respondent, M. A. Gammino Construction Company, the sum of $26,301.50 together with interest thereon at the rate of six per cent (6%) per annum from and after May 17, 1961 to the date of this opinion.

Counsel for libellant will prepare and present for entry an appropriate decree.

In Civil Action No. 2868, judgment will likewise be entered in favor of the plaintiff against the defendant Hartford Accident & Indemnity Company for said sum of $26,301.50, together with interest thereon at the rate of six per cent (6%) per annum from and after May 17, 1961 to the date of this opinion, execution on said judgment to issue only if Gammino shall fail to pay said amount to Moran in accordance with the final decree to be entered in Admiralty No. 1824.